### 1233

D. Stephen RAYFIELD, as Administratrix of the Estate of Billie Lewis Rayfield, Appellant v. SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, William D. Leeke, James E. Aikens, William C. Wallace, Robert L. Foulks, Herbert Davis, William Weston, Eugene R. Grant, Robert E. Reynolds, John E. Huss, Marion Beasley, Lee Cathcart, Rhett Jackson, Hugh L. Lackey, Charles R. Sanders, Jesse Pratt and Grady A. Wallace, Respondents. D. Stephen RAYFIELD, as Administratrix of the Estate of Evelyn R. Rayfield, Appellant v. SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, William D. Leeke, James E. Aikens, William C. Wallace, Robert L. Foulks, Herbert Davis, William Weston, Eugene R. Grant, Robert E. Reynolds, John E. Huss, Marion Beasley, Lee Cathcart, Rhett Jackson, Hugh L. Lackey, Charles R. Sanders, Jesse Pratt and Grady A. Wallace, Respondents.

(374 S. E. (2d) 910)

---

Court of Appeals

*Charles B. Burnette, III,* of *Ridley, Ridley & Burnette,* Rock Hill, *for appellant.*

*Charles E. Carpenter, Jr.,* of *Richardson, Plowden, Grier & Howser,* and *William H. Davidson, II,* of *Nauful & Ellis,* Columbia, *for respondents.*

Heard Jan. 20, 1988.

Decided Oct. 31, 1988.

BELL, Judge:

The Administrator of the estates of Billie Lewis Rayfield and Evelyn R. Rayfield brought these wrongful death actions against the South Carolina Department of Corrections and the South Carolina Department of Parole and Community Corrections. The individual defendants are various officers and servants of the two departments. For convenience, we shall call them the "Corrections Officers" and the "Parole Officers."

The complaint alleges that the Rayfields came to their deaths at the hand of one Cecil Lucas shortly after the Department of Parole freed him from the custody of the Department of Corrections. It goes on to state that the Corrections Officers and the Parole Officers were guilty of negligent acts and omissions which led to Lucas's release. In turn, the release of Lucas is alleged to have caused the Rayfields' deaths. The defendants answered with a qualified general denial and also raised numerous affirmative defenses. After extensive discovery, the circuit court granted the defendants' motions for summary judgment. The Rayfields' Administrator appeals. We affirm.

The facts of the case are as follows:

Shortly after midnight on May 20, 1983, Lucas murdered the Rayfields in their home in Rock Hill, South Carolina.[1] The crime was a random act of violence perpetrated when Lucas broke into the Rayfields' home to commit a robbery. The Rayfields did not know Lucas, nor did he know them.

At the time of the murders, Lucas had a prior criminal record. In 1982, Lucas, then a resident of the Rock Hill area, stole an automobile, which led to his arrest, for grand larceny. While detained in the York County jail, he escaped, but

---

[1] Lucas was later tried and sentenced to death for the murders. *See State v. Lucas,* 285 S. C. 37, 328 S. E. (2d) 63 (1985), *cert. denied,* 472 U. S. 1012, 105 S. Ct. 2714, 86 L. E. (2d) 729 (1985).

was recaptured. He was tried and convicted for grand lar-
ceny and escape. The court sentenced him to two years in
prison. In June 1982, Lucas was transferred to the Depart-
ment of Corrections to serve his time. On a straight time
basis, Lucas would have completed his sentence on July 1,
1984.

In May 1983, Lucas came before the Parole Board for
consideration. After a hearing, the Board ordered his release
on parole. As a condition of his release, Lucas had to live in
West Columbia and work at the Midland Human Resources
Warehouse. His housing and employment were prearranged
as part of his parole agreement. Pursuant to the parole
order, the Department of Corrections released him on May
19, 1983. Several hours later, he murdered the Rayfields.

Viewed in the light most favorable to the Rayfields, the
evidence shows that the Department of Corrections main-
tained records on Lucas dating back to 1973, when he was
imprisoned for a prior offense. Those records reflected that
Lucas was a habitual user of narcotic drugs; that he dis-
played violent behavior while he was under their influence;
that he took overdoses of drugs; that he repeatedly at-
tempted suicide; that he assaulted prison officers and other
inmates; that he had attempted to escape; and that he had a
poor disciplinary record in prison. The evidence also indi-
cated that during his imprisonment, Lucas had liberal ac-
cess to unlawful drugs. There is testimony that one correc-
tional officer actually sold drugs to inmates. During the last
four months before he was released, his prison records docu-
ment no less than a dozen incidents involving drug use or
possession. In summary, Lucas's prison records showed ha-
bitual drug use, violent behavior, and other criminal acts
from 1973 right to the time he was paroled in 1983.

## I.

The Administrator sues for negligence. His theory of lia-
bility is simple. It starts with the factual premise that the
Parole Board had inadequate records when it decided Lucas
should be paroled. This deficiency was twofold: (1) a number
of negative reports in Lucas's prior prison records were not
included in the case file given to the Board; and (2) some
recent incidents of prison misconduct by Lucas were not in

the file because the responsible Corrections Officers had not reported them. Because the records were incomplete, the Board paroled Lucas. Because Lucas was released, he had the opportunity to commit the murders. Because of his past conduct, it was foreseeable he would commit the murders. Because he did commit them, the Corrections and Parole Officers responsible for the inadequate records are liable for the Rayfields' deaths.

The Administrator agrees that to recover for negligence he must show (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach. *South Carolina Insurance Company v. James C. Greene & Co.*, 290 S. C. 171, 348 S. E. (2d) 617 (Ct. App. 1987). The absence of any one of these elements renders the cause of action insufficient. *South Carolina State Ports Authority v. Booz-Allen & Hamilton*, 289 S. C. 373, 346 S. E. (2d) 324 (1986).

On the other hand, the Corrections and Parole Officers assert that (1) they owed no duty of care to the Rayfields; (2) if they did owe a duty, they did not breach it; and (3) if they did breach it, the breach was not the proximate cause of harm to the Rayfields, because it was not foreseeable the breach would lead to their deaths. In addition, the Officers assert that they are shielded from liability for any wrongdoing by (1) sovereign immunity; (2) official immunity; and (3) judicial immunity.

### A.

We begin by addressing the issue of whether the Officers owed the Rayfields a duty of care with regard to the keeping and furnishing of records or the supervision of those activities.

Ordinarily, the common law imposes no duty on a ■■ person to act. An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance. It follows that a person usually incurs no liability for failure to take steps to benefit others or to protect them from harm not created by his own wrongful act. In other words, a person has no duty to protect another from harm inflicted

by a third person. *Sharpe v. South Carolina Dept. of Mental Health*, 292 S. C. 11, 354 S. E. (2d) 778 (Ct. App. 1987) (Bell, J., concurring). Thus, under the general common law rule, the Corrections' and Parole Officers had no duty to protect the Rayfields, or anyone else, from being harmed by Lucas, once he was released.

The Administrator acknowledges these general principles. He maintains, however, that in this case certain statutes discussed below created duties to the Rayfields upon which an action for negligence will lie.

It is true, of course, that a statute may be the source ■ of a duty owed in negligence. For example, a statute may require a railroad train to ring its bell and blow its whistle for a distance of 500 yards from the point where the railroad crosses a publicly travelled way until the engine has passed the crossing. If the train fails to sound these warnings, the railroad company may be liable in negligence for any proximately resulting harm to others. Why? Because the statute creates a special duty of care to those others.

These principles are well illustrated by the cases of *Clifford v. Southern Railway*, 87 S. C. 324, 69 S. E. 513 (1910), and *Hutto v. Southern Railway*, 100 S. C. 181, 84 S. E. 719 (1915).

In *Clifford*, Miss Mary Clifford, in the company of a friend, was driving her buggy along a public highway when she approached a railroad crossing. The highway crossed the tracks at a point where it was difficult to see or hear the approach of a train because of the banks through which the railroad was cut. As they approached the crossing, Miss Clifford and friend looked and listened for an approaching train. They saw and heard none, so they proceeded to cross. Just as the horse was on the track, a work train came upon the crossing, running backward at a high rate of speed. The horse, being frightened by the near approach of the engine, sprang forward and threw the buggy against a wagon standing on the roadside on the far side of the crossing. The buggy overturned, and the unfortunate Miss Clifford was thrown from it and injured. The train had failed to ring its bell and blow its whistle as it approached the crossing. ·

Miss Clifford sued the railroad company in an action for common law negligence. The trial judge instructed the jury

that if the train failed to give the signals required by the statute,[2] the railroad was guilty of negligence; and if the negligence was the proximate cause of Miss Clifford's injury, the railroad was liable for her damages. The jury found for Miss Clifford.

On appeal, the railroad company argued that in an action at common law it was error to charge that failure to signal, as required by the statute, was negligence. The company contended the signalling statute applied only if the action was brought under another statute which provided liability when a person was injured by a collision with a train. Since there was no collision with the train in Miss Clifford's case, the company argued the signalling statute did not apply. The Supreme Court affirmed the judge's charge, holding that the signalling statute created a duty which would support a common law action in negligence. If the statute had been breached, there was negligence *per se*.

In *Hutto*, Murphy Hutto, a Southern yeoman, was plowing his field near the railroad track. The rows ran parallel with the track. At the end of the rows was a "neighborhood road" which crossed the track. Mr. Hutto drove out into this road and stopped, intending to quit work and go to his house, which was on the same side of the track a short distance away. As he took hold of his horse's bridle to unhitch him from the plow, a train ran by without sounding its bell and whistle. The noise of the train so frightened the horse that he jumped, jerking Mr. Hutto across the plowstock and causing him injury.

The Supreme Court reversed the judgment in Mr. Hutto's favor, holding that the signalling statute created no duty to him upon which an action would lie. The Court explained that the statute required signals in order to protect persons who may be using a public way against the dangers of a crossing railroad train. The statute was not intended to protect all persons who might be on or near a railroad track at any and all places; nor was it intended to protect all persons who might be near a railroad crossing, regardless of the use they were making of the public way. If a person was

---

[2] Section 2132, Civil Code of 1902; now codified at Section 58-15-910, Code of Laws of South Carolina, 1976.

simply in the road near a railroad crossing without intending to use the road or to cross the tracks, his presence at that place was incidental for the purpose of the signalling statute. As regards the statute, he would be no different from any person who happened to be on or near a railroad at any place. Since Mr. Hutto was in the public way simply to unhitch his horse, he was no differently situated than if he had been at the other end of his field, away from the neighborhood road and the crossing.

Referring to the *Clifford* case, the Court stated that the difference between Miss Clifford and Mr. Hutto lay in the duty the railroad company owed to each under the statute. The company owed a duty to Miss Clifford because she was crossing the track. The company owed no duty to Mr. Hutto because his injury had no connection with the use or intended use of the crossing. His situation to the crossing was merely casual; and so was the fact that he happened to be in the road, since he was not using the road with respect to the crossing.

From a comparison of these cases and others,[3] we are able to derive a test for determining when a duty created by statute will support an action for negligence. In order to show that the defendant owes him a duty of care arising from a statute, the plaintiff must show two things: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that he is a member of the class of persons the statute is intended to protect.

If the plaintiff makes this showing, he has proven the first element of a claim for negligence: viz., that the defendant owes him a duty of care. If he then shows that the defendant violated the statute, he has proven the second element of a negligence cause of action: viz., that the defendant, by act or omission, failed to exercise due care. This constitutes proof of negligence *per se.*

Negligence *per se* simply means the jury need not decide if the defendant acted as would a reasonable man in the circumstances. The statute fixes the stan-

---

[3] *See, e.g., Bell v. Atlantic Coast Line Railway Co.*, 202 S. C. 160, 24 S. E. (2d) 177 (1943); *Wright v. South Carolina Power Co.*, 205 S. C. 327, 31 S. E. (2d) 904 (1944).

dard of conduct required of the defendant, leaving the jury merely to decide whether the defendant breached the statute. If he did, his failure to take due care is established as a matter of law. The only issue then left for the jury to determine is the third element of negligence, viz., whether the defendant's conduct proximately caused damage to the plaintiff.

From this analysis it should be clear that the plaintiff does not establish a case by showing that observance of the statute would benefit him. Nor can he prevail merely by proving that his injury would not have occurred if the statute had been obeyed. He must satisfy the two requirements stated above to have a cause of action. As our Supreme Court has said:

> "An action for negligence based upon an alleged violation of a statute ... cannot be maintained where it appears that the statute ... was enacted ... for a purpose wholly different from that of preventing the injury of which complaint is made. To afford a right of action for injury from the violation of a statute ... the complainant's injury must have been such as the statute ... was intended to prevent. If none of the consequences which the enactment was designed to guard against have resulted from its breach, such a breach does not constitute an actionable wrong, even though some other injurious consequence has resulted. It is not enough for a plaintiff to show that the defendant neglected a duty imposed by statute and that he would not have been injured if the duty had been performed. He must go further and show that his injury was caused by his exposure to a hazard from which it was the purpose of the statute to protect him."

*Bell v. Atlantic Coast Line Railway Co.*, 202 S. C. 160, 174, 24 S. E. (2d) 177, 183 (1943), quoting 38 Am. Jur. *Negligence*, Section 163 at 834.

## B.

This brings us to the so-called "public duty" rule, a rule the Corrections and Parole Officers raise as a defense against the Rayfields.

The public duty rule is not a separate legal doctrine; it is a special application of the broader principle, already stated, that an action for negligence based upon an alleged violation of a statute cannot be maintained if the statute was enacted for a purpose other than preventing the injury of which complaint is made. The rule applies to the special case of statutes which create or define the duties of a public office.

The law presumes that a statute which creates or defines the duties of a public office has the essential purpose of providing for the structure and operation of the government or of securing the general welfare and safety of the public. These statutes are not intended primarily to protect discrete individuals from particular types of harm. In such cases, any actual benefit or injury to a particular individual from the performance or nonperformance of the duties of the office is incidental to the purpose of the statute. As a rule then, a statute creating duties of office imposes on the public officer no duty of care towards individual members of the public. *See Parker v. Brown,* 195 S. C. 35, 10 S. E. (2d) 625 (1940) (adopting the public duty rule as the law of South Carolina).

In the context of a negligence action, the public duty rule may be stated as follows; a statute prescribing the duties of a public office does not, without more, impose on the person holding that office a duty of care towards individual members of the public in the performance of those duties.[4]

Unfortunately, much confusion surrounds the public duty rule. It is often invoked as if it were a rule of immunity for public officers. It is not, however, a species of immunity. Immunity is an affirmative defense which must be pleaded and can be waived. One who pleads immunity, conditionally admits the plaintiff's case, but asserts his immunity as a bar to liability. The burden is on the defendant to establish his immunity from suit. In contrast, the public rule, if pleaded, is a negative defense. It denies an element of the plaintiff's cause of action—the existence of a

---

[4] Formulations of the rule such as the oft quoted "a duty to all is a duty to none," are both imprecise and offensive to common sense reasoning. These formulations have been frequently and justly criticized. We reject them as misstatements of the rule.

duty of care. The burden is on the plaintiff to establish a duty of care owed to him. *Cf., O'Neal v. Carolina Farm Supply of Johnston*, 279 S. C. 490, 309 S. E. (2d) 776 (Ct. App. 1983) (distinguishing affirmative and negative defenses).[5]

## C.

The plaintiff may prevail against a public duty defense if the statute not only concerns the duties of a public office, but also has the essential purpose of protecting identifiable individuals from a particular kind of harm.[6] In such cases, the statute is said to create a "special duty" or "special relationship" which may give rise to a negligence suit against the officer for failure to perform his duties properly. *See Cracraft v. City of St. Louis Park*, 279 N. W. (2d) 801 (Minn. 1979).

In order to determine if a public officer is under a special duty to the plaintiff, the court must look to the statute and the facts of the particular case. A special duty exists if: (1) an essential purpose of the statute is to protect against a particular kind of harm; (2) the statute, either directly or indirectly, imposes on a specific public officer a duty to guard against or not to cause that harm; (3) the class of persons the statute intends to protect is identifiable before the fact; (4) the plaintiff is a person within the protected class; (5) the public officer knows or has reason to know of the likelihood of harm to members of the class if he fails to do his duty; and (6) the officer is given sufficient authority to act in the circumstances or he undertakes to act in the exercise of his office.

---

[5] The Administrator argues that the public duty rule cannot survive the abolition of sovereign immunity in South Carolina. This argument is based on the common misconception that the public duty rule derives from the doctrine of sovereign immunity. Since it does not, it is unaffected by changes in the law of sovereign immunity.

[6] Courts sometimes err in supposing a statute cannot have both purposes. Often, however, a statute will place certain duties on a public officer as the means for carrying out the larger statutory purpose of protecting members of a defined class from a particular type of harm. In such cases, the dual purposes of the statute are not mutually exclusive. *See Halvorson v. Dahl*, 89 Wash. (2d) 673, 574 P. (2d) 1190 (1978) (en banc) (inspections to enforce building, housing and safety codes).

## D.

We now apply these principles to the case at hand.

The Administrator alleges that the following statutory duties were breached by the Corrections Officers and the Parole Officers:

(1) the Executive Director of the Parole Board, by presenting inadequate records to the Board, breached his statutory duty to manage and control the affairs of the Department, *see* Section 24-21-220, Code of Laws of South Carolina, 1976, as amended:

(2) the Commissioner of Paroles breached his statutory duty to assure that an appropriate case and investigation are prepared for the Parole Board when it meets to consider paroling a prisoner, *see* Section 24-21-14, Code of Laws of South Carolina, 1976, as amended;

(3) the Commissioner of Corrections breached his statutory duty to keep a record of the industry, habits, and deportment of Lucas and to furnish it to the Parole Board upon request, *see* Section 24-21-70. Code of Laws of South Carolina, 1976;

(4) the Warden of Central Correctional Institution breached his statutory duties to keep a record of the industry, habits, and deportment of Lucas and to furnish the Board with such information as will enable it to pass intelligently on applications for parole, *see* Sections 24-21-60 and 24-21-70, Code of Laws of South Carolina, 1976;

(5) the Corrections Officers and supervisors who had custody and control of Lucas breached their statutory duties to keep a record of his industry, habits, and deportment or to supervise their subordinates in the proper keeping of such records, *see* Sections 24-21-60 and 24-21-70. Code of Laws of South Carolina, 1976;

(6) the members of the Parole Board breached their statutory duty to oversee, manage, and control the records as mandated by statute, *see* Sections 24-21-13, 24-21-14, 24-21-60, 24-21-70, 24-21-210, and 24-21-220, Code of Laws of South Carolina, 1976, as amended.

Each of these statutes is alleged to be the source of a duty of care to the Rayfields.

We hold that these statutes create no special duty to the Rayfields. The essential purpose of each is to assign responsibility for the management and control of two state agencies and to provide for the general keeping of records on prisoners. One purpose for keeping records is to provide information to the Parole Board upon which it can make informed decisions about paroling prisoners. But this purpose, like the others, relates primarily to the internal functioning of a governmental agency.

By no stretch of interpretation can it be said the essential purpose of any of these statutes is to guard members of the public against violent crimes by released prsioners. No language in these statutes charges the specific officers with a duty to prevent such crimes.[7] The statutes confer on the officers no authority or means to protect against the harm that came to the Rayfields. Although the information contained in prison records may be incidentally useful in many types of law enforcement, the purpose of keeping the records is not primarily to prevent the commission of crimes against individual citizens. For these reasons, the Corrections and Parole Officers had no special duty to the Rayfields by virtue of the statutes.

In the absence of a duty owed by the defendants to the plaintiffs, an essential element of the Rayfields' negligence actions was missing. Accordingly, the judgment for the defendants was correct.

### E.

In view of our conclusion that there was no duty of care, it is unnecessary to decide if there were material issues of fact touching the elements of breach of duty and proximate causation. Likewise, we need not reach the defenses of sovereign immunity, official immunity, and judicial immunity.

### II.

The Administrator also argues that the Corrections Officers had an affirmative duty to protect the Rayfields from Lucas by reason of his drug addiction. The Administrator's evidence shows that Lucas used drugs

---

[7] That presumably, is the general duty of local officers of the peace.

in prison with the knowledge and acquiescence of the Corrections Officers. His addiction often resulted in episodes of violence and the need for disciplinary action. The Administrator reasons that because the Corrections Officers knew Lucas was dangerous when he used drugs, they stood in a special relationship to Lucas from which arose a duty to control his drug habit in the interest of protecting others from his violent behavior. The Officers' failure to prevent Lucas from using drugs in prision is alleged to have caused the Rayfields' deaths giving rise to liability of the Corrections Officers.

The Adminstrator relies on the principle that a special relationship between the defendant and the plaintiff or the defendant and a third party may give rise to a duty of care to prevent the third party from injuring the plaintiff. *See* Restatement (Second) of Torts Sections 314 through 320 (1965); *Sharpe v. South Carolina Department of Mental Health*, 292 S. C. 11, 354 S. E. (2d) 778 (Ct. App. 1987) (Bell, J., concurring).

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him for doing such harm.

*Semler v. Psychiatric Institute of Washington, D. C.*, 538 F. (2d) 121, 125 (4th Cir. 1976), *cert. denied sub nom. Folliard v. Semler*, 429 U. S. 827, 97 S. Ct. 83, 50 L. Ed. (2d) 90 (1976); *cf.*, *Crowley v. Spivey*, 285 S. C. 397, 329 S. E. (2d) 774 (Ct. App. 1985) (one who undertakes to protect another from harm by a third party has a duty to exercise reasonable care).

We do not question this rule of law. When applied to the facts of this case, however, it affords no basis for the Rayfields' cause of action. The mere knowledge that Lucas was drug addicted and potentially violent did not create a special relationship. A special relationship arose, if at all, from the custody the Department of Corrections exercised over Lucas. While the Department had charge of Lucas, it arguably owed a duty of care to others to prevent foreseeable harm Lucas might do them. But once the Department's

custody of Lucas ended, it no longer had charge of him, and the special relationship based on custody ended.

Lucas was freed by the Parole Board, not by the Department of Corrections. He committed the murders after the Correction's Officers ceased to owe a duty of care to others who foreseeably might be harmed by him. Accordingly, the Corrections Officers were not liable to the Rayfields for the harm inflicted by Lucas.

### III.

Finally, the Administrator insists that summary judgment was granted prematurely.

He first asserts that judgment was entered before discovery was completed. Because the Administrator consented to proceed on the motion for summary judgment while holding further discovery in abeyance, this argument has no merit.

Next he argues that factual disputes going to the issues of breach of duty, proximate causation, and immunity precluded summary judgment. Since those issues need not be decided, however, the facts in dispute are immaterial.

In conclusion, we hold that the defendants owed no duty of care to protect the Rayfields from harm by Lucas. We have reviewed the numerous cases from other jurisdictions which the parties cite in their briefs. Because of differences in the precedents and the statute of those jurisdictions, we find the authorities cited of limited guidance in resolving the issues in this case.

For the reasons stated, we affirm the judgment.

Affirmed.

SANDERS, C. J., and GARDNER, J., concur.