566 S.E.2d 536

**Dexter L. FAILE and Lesa L. Faile, individually and as parents and natural guardians of Brandon Chase Faile, Respondents,**

v.

**SOUTH CAROLINA DEPARTMENT OF JUVENILE JUSTICE, Petitioner.**

No. 25434.

Supreme Court of South Carolina.

Heard Oct. 18, 2000.

Decided July 1, 2002.

---

316

318

320

William H. Davidson, II, and Andrew F. Lindemann, both of Davidson, Morrison & Lindemann, of Columbia, for petitioner.

Lex A. Rogerson, Jr., of Lexington; and Steven Randall Hood, of Law Offices of James C. Anders, of Rock Hill, for respondents.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS.

Justice BURNETT:

We granted certiorari to review the decision of the Court of Appeals overturning the trial court's grant of summary judgment to the South Carolina Department of Juvenile Justice ("DJJ") on the ground DJJ was entitled to quasi-judicial immunity under the South Carolina Tort Claims Act.[1] *Faile v. S.C. Dep't of Juvenile Justice*, Op. No. 99–UP–1811 (S.C. Ct.App. filed June 9, 1999). We affirm in result and remand.

### FACTUAL/PROCEDURAL BACKGROUND

On April 15, 1993, Fredrico R. ("Fredrico"), age 12, violently assaulted Brandon Chase Faile, the nine-year old son of Dexter and Lesa Faile ("Respondents"). Fredrico was a juvenile delinquent on probation at the time of the attack, with nine prior referrals to DJJ on his record.

In February 1992, Fredrico was charged in the Family Court of Chester County with grand larceny of a bicycle. After pleading guilty, Fredrico was committed by Judge Barrineau to the DJJ Reception and Evaluation Center ("R & E")

---

1. When a plaintiff claims an employee of a state agency acted negligently in the performance of his job, the South Carolina Tort Claims Act requires a plaintiff to sue the agency for which an employee works, rather than suing the employee directly. S.C.Code Ann. § 15–78–70(c) (Supp.2001). Whether the DJJ was the proper defendant-agency is discussed in part III of this opinion.

for the purpose of evaluation and recommendation for disposition.

R & E expressed concern over Fredrico's aggressive behavior, recognizing he was impulsive and explosive at times. After receiving the R & E's recommendation, Judge Barrineau, in April 1992, ordered continued probation for one year, a suspended commitment to DJJ, 25 community service hours, placement in a therapeutic foster home, and counseling sessions for Fredrico's parents.

Fredrico was placed in a new foster home in January 1993. However, on April 7, 1993, he was expelled from that home for stealing a knife and gun from a school police officer. He used the gun to threaten his foster mother. Max Dorsey ("Dorsey"), Fredrico's DJJ probation counselor, removed him from the foster home and placed him in the Greenville Group Home for the night of April 7, 1993. Dorsey placed Fredrico with his biological mother on April 8, 1993, claiming that no alternative placement was available for Fredrico.

Five days **after** placing Fredrico with his biological mother, Dorsey filed a Rule to Show Cause with the Family Court to have Fredrico brought before the judge to show why his probation should not be revoked. Judge Barrineau signed the Rule and scheduled a hearing for April 21, 1993. Dorsey told the judge Fredrico had been expelled from his foster home where he was temporarily staying with his family, and Dorsey intended to recommend Fredrico be committed to DJJ. Dorsey failed to inform the judge the placement violated the earlier court order. Judge Barrineau did not indicate he knew the placement violated his earlier order. Dorsey did not request a modification of the earlier order. On April 15, 1993, **before** the hearing was held, Fredrico assaulted Brandon Faile.

Respondents instituted this action against DJJ, alleging DJJ was grossly negligent in placing Fredrico in his family home, and claiming damages of $64,000.00. DJJ moved for summary judgment. The trial court granted DJJ's motion on the ground that DJJ was entitled to quasi-judicial immunity pursuant to S.C.Code Ann. § 15–78–60(1) (Supp.2001). Respondents appealed.

The Court of Appeals reversed the trial court, holding a question of fact remained whether the trial judge ratified Dorsey's administrative act (placing Fredrico at home), thereby converting it into a judicial act entitling DJJ to quasi-judicial immunity.

DJJ petitioned for certiorari, asserting the Court of Appeals erred in reversing the trial court's grant of summary judgment. The following issues are before us on certiorari:

I. Did the Court of Appeals err in failing to recognize that DJJ was entitled to quasi-judicial immunity under the South Carolina Tort Claims Act because Dorsey's placement of Fredrico in his family home was a judicial act?

II. Did the Court of Appeals err in refusing to consider DJJ's additional sustaining grounds?

III. Is the trial court's decision to grant summary judgment supported by the following additional sustaining grounds:

A. DJJ is not the proper party to the lawsuit;

B. DJJ is entitled to discretionary immunity under the Tort Claims Act;

C. DJJ is entitled to immunity under the juvenile release exception to the Tort Claims Act; or

D. DJJ did not owe a duty of care to Respondents' child.

## LAW/ANALYSIS

### I. Quasi–Judicial Immunity

**A. Judicial Act Requirement**

■ DJJ argues Dorsey's placement of Fredrico in his family home was a judicial act for which he was entitled to quasi-judicial immunity, and therefore the Court of Appeals erred in reversing the trial court's grant of summary judgment to DJJ. We disagree.

■ Summary judgment is appropriate when it is clear there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Bishop v. South Carolina Dep't of Mental Health,* 331 S.C. 79, 502

S.E.2d 78 (1998). In determining whether a genuine question of fact exists, the court must view the evidence and all inferences which can be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Id.* The governmental entity claiming an exception to the waiver of immunity under the Tort Claims Act has the burden of establishing any limitation on liability. *Strange v. S.C. Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 445 S.E.2d 439 (1994). Provisions establishing limitations on liability must be liberally construed in the State's favor. S.C.Code Ann. § 15–78–20(f) (Supp.2001).

▪ The issue of whether juvenile probation officers are entitled to quasi-judicial immunity under the Tort Claims Act is one of first impression in South Carolina. Section 15–78–60(1) provides: "[t]he governmental entity is not liable for a loss resulting from: legislative, judicial, or quasi-judicial action or inaction." In addition to the judicial immunity under the Tort Claims Act, common law judicial immunity was expressly preserved in South Carolina under the Tort Claims Act. *O'Laughlin v. Windham*, 330 S.C. 379, 498 S.E.2d 689 (Ct. App.1998), *cert. denied* 1999 Shearouse Adv. Sh. No. 10 at p. iv.

▪ South Carolina recognizes three exceptions to judicial or quasi-judicial immunity. Judges and other officials are not entitled to judicial immunity if: (1) they did not have jurisdiction to act; (2) the act did not serve a judicial function; or (3) the suit is for prospective, injunctive relief only. *Id.* at 385, 498 S.E.2d at 692. The second exception, which emphasizes the importance of the act, as opposed to the actor, is relevant here. Under the second exception, even judges are not insulated by judicial immunity when they act in an administrative capacity. *Id.* (citing *Forrester v. White*, 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988)). In determining whether an act is judicial, the Court looks to the nature and function of the act. *Id.; Mireles v. Waco*, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991); *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978).[2] Therefore, we must

---

2. The United States Supreme Court extends absolute immunity to protect some quasi-judicial actors, such as prosecutors and witnesses, who perform judicial functions. *Briscoe v. LaHue*, 460 U.S. 325, 103

determine whether probation officer Dorsey's placement of Fredrico had the nature and function of a judicial act, thereby entitling him, and thus DJJ, to quasi-judicial immunity.

Much of the analysis of judicial immunity has been made in the federal arena. Several federal circuits have granted probation officers quasi-judicial immunity, but only when carrying out certain functions the courts have deemed to be judicial. The Tenth Circuit has held that federal probation officers are absolutely immune when the action challenged is "intimately associated with the judicial phase of the criminal process." *Tripati v. United States Immigration & Naturalization Serv.*, 784 F.2d 345 (10th Cir.1986) (finding probation officer immune for damages resulting from reporting plaintiff's conviction to immigration authorities). The Tenth Circuit has made clear the immunity arises from protected functions, not from protected individuals. *Mee v. Ortega*, 967 F.2d 423 (10th Cir. 1992); *Forrester, supra*. The key element is whether the officer was engaged in adjudicatory duties when the challenged act occurred. *Harper v. Jeffries*, 808 F.2d 281 (3d Cir.1986).

Other federal circuit courts have granted probation officers absolute immunity in preparing pre-sentencing reports, and in other situations when they act "as an arm of the court." *Gant v. United States Probation Office*, 994 F.Supp. 729, 733 (S.D.W.Va.1998) (citations omitted). Many of these courts, however, find no absolute immunity for the same type of officer when the officer is acting in his executive capacity. *Gant, supra; Ray v. Pickett*, 734 F.2d 370 (8th Cir.1984); *Ortega, supra; see also Harper v. Jeffries*, 808 F.2d 281 (3d Cir.1986) (denying absolute immunity of probation officer for charging appellant and presenting evidence against him at a parole hearing, because those were his duties as a parole officer).

---

S.Ct. 1108, 75 L.Ed.2d 96 (1983); *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). However, determining whether an individual is entitled to absolute immunity requires the court to consider the function performed by the individual, rather than the individual's position. *Forrester, supra* (denying absolute immunity for parole officer's detainment of parolee, but recognizing functions, such as testifying at a parole hearing, for which a parole officer is entitled to absolute immunity).

If the individual is acting pursuant to a direct court order, courts are more likely to grant quasi-judicial immunity for that action. In *Babcock v. Tyler*, 884 F.2d 497 (9th Cir.1989), a father sued the state for the actions of two social workers who placed his daughters in a home where they were sexually abused. The social workers placed the girls temporarily in the abusive home in April 1982. *Id.* at 449. The juvenile court confirmed the placement by order in May 1982. The sexual abuse did not occur until sometime after May. *Id.* Plaintiffs argued the social workers were not entitled to immunity for the temporary placement of the girls before the court order was issued. The court discounted this argument as irrelevant, however, on the grounds the abuse did not occur until **after** the court had confirmed the placement. *Id.*

Respondents argue the court's confirmation of the placement was essential to the court's finding of judicial immunity in *Babcock*. Conversely, DJJ cites *Babcock* as holding that placement is a judicial act even if not made pursuant to a direct court order. DJJ's argument, however, overlooks that the judge formally confirmed the placement **before** the injury took place. In the present case, Judge Barrineau's mere knowledge that Fredrico was placed in his family's home, in the absence of any further act by him, does not amount to confirmation or ratification of Dorsey's act.

 Viewing the facts and all inferences that can be drawn in the light most favorable to Respondents, as the non-moving party, the trial court erred in granting summary judgment to DJJ on this ground. We agree with our Court of Appeals' conclusion that the placement of juveniles by a probation counselor is an administrative function. We find persuasive the precedent discussed above from other jurisdictions which supports this analysis. Just as police officers are not granted absolute immunity when they apply for arrest warrants, probation officers generally are not immune in performing their enforcement duties. *See Gant, supra; Acevedo v. Pima County Adult Prob. Dep't,* 142 Ariz. 319, 690 P.2d 38 (1984)(holding that supervision of probationers is an administrative task, unconnected with the performance of a judicial function). Dorsey's placement of Fredrico was administrative. The Family Court's mere knowledge that Dorsey placed Fre-

drico with his family, without more, is insufficient to convert that placement into a judicial act.

For the forgoing reasons, we conclude DJJ is not entitled to quasi-judicial immunity.

## B. Agent of the Court

■■■ DJJ argues a juvenile probation officer acts as an agent and representative of the Family Court, and, therefore, Dorsey's placement of Fredrico was a quasi-judicial act entitling him to immunity under the Tort Claims Act, S.C.Code Ann. § 15–78–60(1). We disagree.

DJJ cites *Fleming v. Asbill,* 326 S.C. 49, 483 S.E.2d 751 (1997), for the proposition that "non-judicial officers are entitled to quasi-judicial immunity for carrying out a function assigned by the court." In *Fleming,* we granted absolute judicial immunity to a court-appointed guardian ad litem based on common law theories. *Id.* This Court did not apply the Tort Claims Act in *Fleming* because we found the guardian ad litem was not an employee of the state as defined by section 15–78–30(c) of the Act. We held, however, that common law judicial immunity protected the guardian from liability in the performance of her official duties, despite a line of cases holding guardians ad litem liable for negligence. *Id.; see McIver v. Thompson,* 117 S.C. 175, 108 S.E. 411 (1921). We distinguished those cases based on the dramatically different role of court-appointed guardians ad litem in child custody suits today. *Fleming, supra.*

In *Fleming,* this Court based the grant of immunity for court-appointed guardians on the necessity for guardians to be able to act without fear of lawsuits as well as the inequity of holding guardians liable for negligence. DJJ argues that the guardians were awarded immunity merely for being representatives of the court. Although we indicated the guardians were representatives of the court, it was not the decisive factor in our decision to grant guardians immunity. A primary role of the guardian is to be an advocate within the courtroom. However, guardians are not "acting on 'behalf' of the court; [they] do not affect legal relationships between the court and third parties." *Fleming,* 326 S.C. at 53, 483 S.E.2d 751. Their job is to represent their ward's interest before the

court, unlike probation officers whose duties extend far beyond the courtroom.

Additionally, the role of a court-appointed guardian is distinguishable from the role of a DJJ probation officer because the guardian's participation ends when the court renders its decision. The DJJ officer's role does not. Instead, the officer is essentially charged with executing the court's orders. While the officer may be entitled to judicial immunity when executing those orders, the present case involves an officer who, at least for summary judgment purposes, deviated from the explicit terms of the order.

For these reasons, we decline to hold that DJJ is entitled to summary judgment for judicial immunity as an agent of the Family Court.

## II. Additional Grounds

Additional grounds are raised to support the trial court's granting of summary judgment. Though we are not required to do so we address each in the interest of judicial economy. Our conclusions are based upon the facts before us and the parties are not precluded from further development of the issues we address.

### A. Proper Party

DJJ contends the Family Court, not DJJ, is the proper party to this litigation. DJJ argues Dorsey was not acting on its behalf, but on behalf of the family court since the court retained authority over Fredrico. We disagree.

The Tort Claims Act requires a plaintiff to sue "only the agency ... for which the employee was acting." S.C.Code Ann. § 15–78–70(c) (Supp.2001). An agency is defined as the state entity "which employs the employee whose act or omission gives rise to a claim." S.C.Code Ann. § 15–78–30(a) (Supp.2001). There is no disagreement Dorsey's actions gave rise to this claim. The question is whether Dorsey was acting on behalf of the family court or DJJ.

As discussed above, this Court in *Fleming, supra,* determined whether a guardian ad litem was an employee under the Tort Claims Act. The Court held that while the guardian is appointed as a court representative to assist the court, it is

"not acting on 'behalf' of the court." *Id.* at 53, 483 S.E.2d at 753. "The relationship between the Court and a guardian ad litem is not an agency relationship" nor an "employee-employer relationship." *Id.* Like a guardian ad litem, the juvenile probation officer is characterized as an "agent of the court." [3] Like the guardian, the probation officer is not acting on behalf of the family court, but is there to assist the court. The probation officer is responsible for conducting investigations, providing relevant information to the court, and taking charge of a child if ordered by the court. *See id.*

A probation officer is an employee of DJJ, not the family court. This Court in *Chavis v. Watkins,* 256 S.C. 30, 32, 180 S.E.2d 648, 649 (1971), there are four factors used to determine whether a person is an employee of a particular entity. The factors are: (1) who has the right to control the person; (2) who pays the person; (3) who furnishes the person with equipment; and (4) who has the right to fire the person. While a court may direct a probation officer to assist in aiding the court in its adjudication of a case, DJJ also has the right to control the actions of probation officers who are its employees.[4] DJJ does not deny it pays Dorsey, furnishes him with the equipment needed to perform his job, and has the ability to discharge him. DJJ argues, however, that since probation officers are agents of the court, they are controlled by it. While the family court has a right to direct a probation officer to perform certain tasks, this fact alone is not dispositive of whether Dorsey is an employee of the court. *See Simmons v. Robinson,* 305 S.C. 428, 409 S.E.2d 381 (1991). More important is the *Fleming* rule that the court "agent" is assisting the court, but is not acting as a true agent on its behalf.

It is also important to look at the plain meaning of sections 15–78–70(c) and 15–78–30(a). In attempting to harmonize the two sections, we determine a plain reading to be that "only the

---

3. *See* S.C.Code Ann. § 20–7–2155 (1976), repealed by 1996 Act 383. The principle of the probation officer as being an agent of the court is now codified at S.C.Code Ann. § 20–7–8335(C) (Supp.2001).

4. *See* S.C.Code Ann. § 20–7–2155 (1976), repealed by 1996 Act 383. After the events giving rise to this suit, the General Assembly passed legislation explicitly giving the director of DJJ the power to direct a juvenile probation officer in the performance of duties. *See* S.C.Code Ann. § 20–7–6840 (Supp.2001).

entity employing the employee whose act gives rise to the claim may be sued." DJJ's argument would lead to a cramped interpretation of the statute. If followed by this Court, DJJ's interpretation would immunize all officials whose duties bring them under some direction of a court.

We conclude, based on the facts before us, DJJ is the properly named defendant.

## B. Discretionary Immunity

DJJ argues its motion for summary judgment can be sustained on the ground it is entitled to discretionary immunity under the Tort Claims Act. We disagree.

A governmental entity is not liable for losses resulting from an exercise of discretion by its employees. Section 15–78–60(5) of the South Carolina Tort Claims Act exempts governmental entities from liability for losses resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." Discretionary immunity is an affirmative defense requiring DJJ to prove Dorsey evaluated competing alternatives and made a "judgment" call based on applicable professional standards. *Foster v. South Carolina Dep't of Highways & Pub. Transp.,* 306 S.C. 519, 413 S.E.2d 31 (1992).

In determining whether Dorsey's action was discretionary, it is helpful to compare the two classifications for the duties of public officials. The duties of public officials are generally classified as either ministerial or discretionary. *Jensen v. Anderson County Dep't of Soc. Servs.,* 304 S.C. 195, 403 S.E.2d 615 (1991) "The duty is ministerial when it is absolute, certain, and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Id.* at 203, 403 S.E.2d at 619. The duty is discretionary if the governmental entity proves it actually weighed competing considerations, faced with alternatives, and made a conscious decision based upon those considerations. *Id.* (*citing Niver v. Dep't Highways & Pub. Transp.,* 302 S.C. 461, 395 S.E.2d 728 (Ct.App.1990)).

In *Jensen*, this Court affirmed the Court of Appeals' finding that insufficient evidence was submitted to determine whether the Department of Social Services ("DSS") made a discretionary decision. *Id.* In the case, a teacher reported a potential child abuse case to DSS. A DSS social worker interviewed the child, and noted the presence of bruises and the child's fear of the mother's boyfriend. However, the social worker failed to follow up on the interview and eventually closed the file. One month later, the child's brother was beaten to death in the home. The Court held that DSS had a duty to conduct a thorough investigation before deciding to close the file. The Court concluded that conducting the investigation was ministerial but closing the file was discretionary because it required applying facts discovered through investigation to reach a decision. *Id.* Despite the fact that closing the file is discretionary, the Court held that there was insufficient evidence to grant discretionary immunity, because the decision was due to failure to complete the investigation, an administrative function, rather than a weighing of competing considerations. *Id.*

In the present case, DJJ claims Dorsey's decision to place Fredrico in his home after he was expelled from his foster home was a discretionary decision. Respondents claim Dorsey placed Fredrico in his family home because he thought no one else would take him. However, Respondents argue there was alternative placement available in the Greenville Group Home, which had agreed earlier to take Fredrico in an emergency. Therefore, Respondents claim if Dorsey had weighed competing alternatives, he would have placed Fredrico in the Greenville Group home. Based on our holding in *Jensen* and the evidence before us, DJJ is not entitled to discretionary immunity.

 In addition, even if we held Dorsey exercised discretion, the performance of discretionary duties does not give rise to immunity if the public official acted in a grossly negligent manner. *See Jackson v. South Carolina Dep't of Corr.*, 301 S.C. 125, 390 S.E.2d 467 (Ct.App.1989) *aff'd*, 302 S.C. 519, 397 S.E.2d 377 (1990). "Gross negligence is the intentional, conscious failure to do something which is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." *Richardson v. Hambright*, 296 S.C. 504, 506, 374 S.E.2d 296, 298 (1988). It is the failure to exercise

even the slightest care. *Hollins v. Richland County Sch. Dist. One,* 310 S.C. 486, 427 S.E.2d 654 (1993). This Court has also defined it as a relative term that "means the absence of care that is necessary under the circumstances." *Hicks v. McCandlish,* 221 S.C. 410, 415, 70 S.E.2d 629, 631 (1952).

Gross negligence is ordinarily a mixed question of law and fact. *See Clyburn v. Sumter County School District # 17,* 317 S.C. 50, 451 S.E.2d 885 (1994). When the evidence supports but one reasonable inference, it is solely a question of law for the court, otherwise it is an issue best resolved by the jury. *Id.* In most cases, gross negligence is a factually controlled concept whose determination best rests with the jury.

In *Jackson, supra,* a jury found the Department of Corrections grossly negligent for placing a prisoner with strong violent tendencies into a minimum security prison, where he killed a fellow inmate. The Court of Appeals found the Department of Corrections transferred the inmate even though they knew he had multiple disciplinary violations, including the killing of a fellow inmate. The Court of Appeals held the jury could view the transfer as gross negligence since it demonstrated a "conscious indifference to the threat posed to the safety of other inmates." *Jackson,* 301 S.C. at 125, 390 S.E.2d at 468.

In the instant case, Dorsey placed Fredrico into a home where DJJ workers noted there was no proper supervision. Furthermore, Dorsey knew of Fredrico's violent tendencies. He even wrote before the incident that he "wouldn't give (Fredrico) two weeks with his mother before he would get into big trouble."

Based on the facts before us, DJJ is not entitled to discretionary immunity as a matter of law. At a minimum, Faile has presented enough evidence to overcome DJJ's summary judgment motion on the matter.

## C. Juvenile Release Exception

DJJ argues it is entitled to summary judgment because it is granted immunity under the juvenile release exception to the Tort Claims Act. We disagree.

Under Section 15–78–60(21), a governmental entity is not liable for "the decision to or implementation of release, discharge, parole, or furlough of any person in the custody of any governmental entity, including but not limited to a prisoner, inmate, juvenile, patient, or client, or the escape of these persons." DJJ argues that the present case falls squarely within this exception based on Respondents' allegations that Fredrico was in the DJJ's custody and was negligently released from that custody.

Despite the Respondents' factual allegations, however, it does not appear Fredrico was released from his relationship with the DJJ, whether it was a custodial relationship or not. Neither Respondents nor DJJ present any case law on this exemption. However, on its face, the exemption appears to apply to a narrower set of circumstances than those presented in this case. The language of the exemption indicates the custodial entity must make a conscious, if not formal, decision to terminate the relationship before this immunity is triggered. DJJ did not do so in this case. Dorsey placed Fredrico in his home temporarily and appears to have had the authority to remove him at any time. Without further evidence, we conclude the juvenile release exemption does not protect the DJJ from liability.

■ Furthermore, although § 15–78–60(21) does not contain a gross negligence exception, this Court has recognized that "when a governmental entity asserts various exceptions to the waiver of immunity … [the court] must read exceptions that do not contain the gross negligence standard in light of exceptions that do contain the standard." *Steinke v. South Carolina Dep't of Labor, Licensing, and Regulation,* 336 S.C. 373, 395, 520 S.E.2d 142, 153 (1999). Therefore, even if Dorsey's actions fell within the release exception, a jury could find his actions were grossly negligent.

## D. Duty of Care

■ DJJ argues the trial court's grant of summary judgment is supported because DJJ owed no legal duty of care to the Respondents' son when he was assaulted by Fredrico. We disagree.

In a negligence action, the court must determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff. *Steinke, supra.* "If there is no duty, then the defendant in a negligence action is entitled to a directed verdict." *Steinke,* 336 S.C. at 387, 520 S.E.2d at 148.

Under South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger. *Rogers v. South Carolina Dep't of Parole & Cmty Corr.,* 320 S.C. 253, 464 S.E.2d 330 (1995); *Rayfield v. South Carolina Dep't of Corr.,* 297 S.C. 95, 374 S.E.2d 910 (Ct.App.1988), *cert. denied,* 298 S.C. 204, 379 S.E.2d 133 (1989); Restatement (Second) of Torts § 314 (1965). We recognize five exceptions to this rule: 1) where the defendant has a special relationship to the victim;[5] 2) where the defendant has a special relationship to the injurer;[6] 3) where the defendant voluntarily undertakes a duty;[7] 4) where the defendant negligently or intentionally creates the risk;[8] and 5) where a statute imposes a duty on the defendant.[9] *See generally,* Hubbard & Felix, *The South Carolina Law of Torts* 57–72 (1990).

---

5. *See, e.g., Ballou v. Sigma Nu Gen. Fraternity,* 291 S.C. 140, 352 S.E.2d 488 (Ct.App.1986) (duty of Fraternity to protect an intoxicated person based on its relationship with the victim); Restatement (Second) of Torts § 315(b) (1965) ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless ... a special relation exists between the actor and the other which gives to the other a right to protection.").

6. *See Rogers, supra.* When a party is in a position to monitor, supervise, and control a person's conduct, a special relationship between the defendant and the dangerous person may trigger a common law duty to warn potential victims of the danger posed by the individual. This special duty is limited to situations where the person under the defendant's control has made a "specific threat directed at a specific individual." *Id.* at 256, 464 S.E.2d at 332.

7. *See, e.g., Caldwell v. Jim Walter Homes, Inc.,* 293 S.C. 229, 359 S.E.2d 518 (Ct.App.1987); Restatement (Second) of Torts §§ 323–24A (1965).

8. *See, e.g., Montgomery v. National Convoy & Trucking Co.,* 186 S.C. 167, 195 S.E. 247 (1938); Restatement (Second) of Torts §§ 321–22 (1965).

9. *See, e.g., Steinke v. South Carolina Dep't of Labor, Licensing, and Regulation, supra.*

The present case, based upon the facts before us, falls within the second category. The Restatement provides no duty exists "to control the conduct of a third person as to prevent him from causing physical harm to another unless ... a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Restatement (Second) of Torts § 315(a) (1965). Section 319 provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) of Torts § 319 (1965).

Our courts have customarily applied § 315 and § 319 in conjunction with duty to warn cases. *See Bishop, supra; Rogers, supra; Rayfield, supra.* We have held a defendant has a duty to exercise reasonable care by issuing warnings after the third party has made specific threats to a specific individual. The rationale behind this line of cases is an individual does not have a duty to protect the public from speculative harm from a dangerous individual within his control. However, where the custodian knows of a specific, credible threat from a person in their care the injury is no longer speculative in nature.

The application of § 319 is not limited to duty to warn cases. The use of the § 319 custodial duty of care in such cases is a slight misnomer. Duty to warn cases normally involve a defendant who has legally released a third party from direct custodial control or who releases the third party after medical evaluation. *See Bishop, supra* (defendant discharged third party mental patient from its care); *Rogers, supra* (defendant released third party to furlough program); *Rayfield, supra* (defendant released third party on parole). More importantly, those cases deal with claims of a defendant's duty to **warn.** Plaintiffs in none of these cases asserted a breach by the defendant of a common law duty to **control** a dangerous person in their custody. *See Bishop, supra* (plaintiff claimed defendant failed to warn victim of third party's release from a mental hospital); *Rogers, supra* (plaintiff argued defendant failed to warn victim of a dangerous third party's furlough); *Rayfield, supra* (plaintiff asserted defendant was liable for breaching its statutory duties in paroling third party).

In the present case, Respondents do not assert DJJ had a duty to warn potential victims. Instead, Respondents assert a breach of the duty to supervise and control a dangerous juvenile by the custodial entity. Therefore, Respondents argue DJJ had a specific § 319 duty to control a dangerous person legally placed in its direct custodial care. While this Court has never explicitly recognized such a duty, at least two appellate decisions mention a similar duty in dicta. *See Jackson, supra; Rayfield, supra.*

In *Jackson* we addressed the issue of discretionary immunity and the standard for gross negligence. The Court of Appeal's decision, which we affirmed, seems to presume, without argument, that the Department of Corrections had a duty to control a knowingly violent inmate in its custody from harming another inmate. *See, Jackson,* 301 S.C. at 126, 390 S.E.2d at 468 ("if the Department was grossly negligent in its duty to control ... [the attacker] and this negligence proximately caused [victim's] death, its immunity from liability under the Act is waived.").

Rayfield addressed many issues including plaintiff's assertion that the Department of Corrections had a special relationship with the third party which gave rise to a duty to prevent the third party from injuring the plaintiff. The Court of Appeals quotes § 319 to support the assertion. *See Rayfield,* 297 S.C. at 109, 374 S.E.2d at 918. However, in denying a duty existed, the court wrote:

We do not question this rule of law [§ 319]. When applied to the facts of this case, however, it affords no basis for the Rayfields' cause of action. The mere knowledge that Lucas was drug addicted and potentially violent did not create a special relationship. A special relationship arose, if at all, from the custody the Department of Corrections exercised over Lucas. While the Department had charge of Lucas, it arguably owed a duty of care to others to prevent foreseeable harm Lucas might do them. But once the Department's custody of Lucas ended, it no longer had charge of him, and the special relationship based on custody ended.

*Id.,* 297 S.C. at 109–10, 374 S.E.2d at 918.

Though not controlling, the Court of Appeals clearly presumed a § 319 duty is a recognizable duty where a defendant has custodial care of a dangerous third party.

The Fourth Circuit, in a case factually similar to the case *sub judice*, found an independent duty to control a dangerous individual under § 319. *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir.1976), *cert. denied sub nom., Folliard v. Semler*, 429 U.S. 827, 97 S.Ct. 83, 50 L.Ed.2d 90 (1976). *Semler* involved Steven Gilreath ("Gilreath"), a mental patient found guilty of murder. A state court judge suspended Gilreath's sentence on the condition he be confined to receive treatment at the Psychiatric Institute of Washington ("Institute").

Gilreath's probation officer requested weekend passes over the next few months, based on a doctor's recommendation. The judge granted the weekend passes. Eventually, the judge modified the order to give the probation officer discretion to issue Gilreath weekend passes. As Gilreath proceeded with treatment, his doctor and probation officer agreed to transfer him from twenty-four hour supervision to day care status at the Institute. The judge approved the transfer.

Based on a doctor's recommendation, the probation officer gave Gilreath a three-day pass to investigate the possibility of moving to Ohio. Later, the probation officer gave Gilreath a fourteen-day pass to return to Ohio to prepare his transfer. The probation officer did not submit either pass for judicial approval.

Anticipating Gilreath's transfer to Ohio, the Institute, contrary to the court order, discharged him. Although the Institute notified the probation officer, the court remained uninformed. When Ohio rejected Gilreath's parole transfer, the probation officer ordered his return to Virginia. The Institute re-admitted Gilreath to its program, but only on an out-patient basis, requiring him to meet in a group setting two nights a week. The change in status was contrary to the latest court order.

Additionally, Gilreath no longer lived with his parents as he had when he was in day care status, but instead lived alone, unsupervised. The probation officer never informed the judge of the new arrangement. Two months after returning to Virginia, Gilreath murdered another individual.

The Fourth Circuit, in upholding a civil verdict against the Institute and the probation officer, held each owed a duty to

the victim. The court noted the judge ordered Gilreath "to receive treatment at and remain confined in the Psychiatric Institute until released by the Court." *Id.*, 538 F.2d at 124. The Institute and probation officer argued the order's purpose was to rehabilitate Gilreath, therefore it created a duty only to him and not to any third party victims. The court held the order's purpose was twofold: to provide care for Gilreath and to protect the public from Gilreath. The Fourth Circuit noted the trial court was particularly concerned that Gilreath, who had a known history of attacking young girls, presented a foreseeable risk to the public.

Releasing Gilreath from the day care program violated the judgment of the court which determined confinement was in the best interest of the community. "The special relationship created by the probation order, therefore, imposed a duty on [the Institute and probation officer] to protect the public from the reasonably foreseeable risk of harm at Gilreath's hands [which] the state judge had already recognized." *Id.*, 538 F.2d at 125.

The Fourth Circuit, construing § 319 of Restatement (Second) of Torts (1965), ruled the order itself provided the boundaries of the custodian's duty. *Id.* The Institute and the probation officer were obligated by the court order to retain custody over Gilreath until the court released him. "No lesser measure of care would suffice ... they could not substitute their judgment for the court's with respect to the propriety of releasing him from confinement." *Id.*

In the present case, Judge Barrineau's April 1992 order placed Fredrico on probation for one year. The order suspended commitment to DJJ if Fredrico was placed in a therapeutic foster home. Fredrico's parents were ordered to undergo counseling. After his expulsion from the foster home, the probation counselor placed him in a group home for a night, then with his biological mother.

Dorsey placed Fredrico into a home without proper supervision. Dorsey was aware of Fredrico's violent tendencies. More importantly, Dorsey returned Fredrico to his mother's home in direct contradiction to the court order.

While *Semler* does not equate the § 319 duty with the "custodial entity's duty to obey court orders," we find § 319 to

be, as decided by the Fourth Circuit, "close to the point." *Id.* This Court is reluctant to impose the duty to control unless there is an established authority relationship and a substantial risk of serious harm. *See* Hubbard & Felix, *supra*, at 64–65. Here, DJJ had custody of a known dangerous individual. It had an independent duty to control and supervise Fredrico to prevent him from harming others as long as it retained custody of him by court order.

## CONCLUSION

For the foregoing reasons, we **AFFIRM IN RESULT** and **REMAND** this case to the Circuit Court for proceedings consistent with this opinion.

TOAL, C.J., MOORE, WALLER and PLEICONES, JJ., concur.