PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JANE DOE, by and through her
guardians Gregory and Michelle
Johnson; GREGORY JOHNSON;
MICHELLE JOHNSON; JOHN AND JANE
DOES, #1-10,

        *Plaintiffs-Appellants,*

        v.

SOUTH CAROLINA DEPARTMENT OF
SOCIAL SERVICES, SCDSS; DEBBY
THOMPSON; ELIZABETH G.
PATTERSON, Director; KIM S.
AYDLETTE, Director,

        *Defendants-Appellees,*

        and

KAMERON SETH COX; TITSA M.
FLESCH; HEALTHY MINDS, LLC;
JOHN AND JANE ROES, #1-10;
MANAGERIAL ROES, #1-10;
SUPERVISORY ROES, #1-10;
CASEWORKER ROES, #1-10; FOSTER
PARENT ROES, #1-10,

        *Defendants.*

No. 08-2161

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(3:06-cv-03663-JFA; 3:07-cv-01629-JFA)

Argued: October 15, 2009

Decided: March 5, 2010

Before TRAXLER, Chief Judge, WILKINSON,
Circuit Judge, and HAMILTON, Senior Circuit Judge.

---

Affirmed in part, vacated in part, and remanded by published
opinion. Chief Judge Traxler wrote the majority opinion, in
which Senior Judge Hamilton joined. Judge Wilkinson wrote
a separate opinion concurring in the judgment.

---

## COUNSEL

**ARGUED**: Robert James Butcher, CAMDEN LAW FIRM,
PA, Camden, South Carolina, for Appellants. Andrew Linde-
mann, DAVIDSON & LINDEMANN, PA, Columbia, South
Carolina, for Appellees. **ON BRIEF:** William H. Davidson,
II, Katy A. Rice, DAVIDSON & LINDEMANN, PA, Colum-
bia, South Carolina, for Appellees.

---

## OPINION

TRAXLER, Chief Judge:

Jane Doe, a minor child, and her adoptive parents, Gregory
and Michelle Johnson, brought this action under 42 U.S.C.A.
§ 1983 (West 2003), against Debby Thompson
("Thompson"), an Adoption Specialist with the South Caro-
lina Department of Social Services ("SCDSS"), alleging vio-
lations of their substantive due process rights under the
Fourteenth Amendment to the United States Constitution.
Plaintiffs brought additional state law claims against SCDSS

under the South Carolina Tort Claims Act ("SCTCA"), *see* S.C. Code Ann. §§ 15-78-10 to 15-78-220 (1976), alleging gross negligence on the part of SCDSS and its employees. The district court granted summary judgment on the § 1983 claims in favor of Thompson based upon qualified immunity, and summary judgment to SCDSS based upon discretionary immunity. We affirm in part, vacate in part, and remand.

## I.

On August 9, 1999, SCDSS received a report that four-year-old Jane Doe and her eight-year-old brother, Kameron Cox, were victims of sexual abuse. The report alleged that Kameron had been sexually abused by his mother and that Jane had been sexually abused by her mother's boyfriend and her maternal grandfather. The biological father of the children was incarcerated in another state.

Upon receipt of the report, SCDSS officials took the children into emergency protective custody. During the subsequent investigation, Kameron claimed that his mother had sexually abused him, and denied knowledge of anyone sexually abusing Jane. Jane's mother denied abuse but reported that "Kameron had played with [Jane]'s private but she told him not to do it anymore." J.A. 479. Ultimately, the sexual abuse assessments and medical examinations were inconclusive as to whether the children had been sexually abused. However, the South Carolina Family Court found physical neglect and granted SCDSS temporary custody of the children. No findings were made regarding the sexual abuse allegations. Physical custody of the children was initially transferred to a maternal aunt, but she relinquished the children to SCDSS's legal custody in July 2000. They were placed in a group home until September 2000 when they were moved to their first state-approved foster home.

On June 18, 2001, Joy Bennett, the children's therapist, reported that Kameron had become increasingly angry and

depressed at his inability to return to his mother's home. She stated that he posed a threat to himself and to Jane, and she recommended psychiatric hospitalization. However, she also recommended that, in order to maintain the bond between Kameron and Jane, the two ultimately should continue to be placed together "if this c[ould] be done safely" for Jane. J.A. 436. According to the psychiatric records, Kameron had a history of depression, suicidal and homicidal thoughts, and had become increasingly aggressive and hostile toward Jane. Kameron blamed Jane for their being in foster care "because she made statements that [their] mother, stepfather, and maternal grandfather [had] sexually molested her," but Kameron "d[id] not believe her allegations." J.A. 536. The psychiatric records also included a history of sexual experimentation by Kameron and Jane with each other, possible sexual abuse of the children, and possible intergenerational incest.

On May 30, 2001, the defendant Debby Thompson, an employee of SCDSS, was assigned as the Adoption Specialist for the children. On July 5, 2001, Kameron was discharged from the hospital and placed in a foster home separate from Jane. Thompson began visiting the children later that month, but Kameron's threats to Jane necessitated postponement of recruitment efforts for a joint adoption of the siblings "until a determination of the appropriateness of an adoptive placement of [Jane] and Kameron together c[ould] be made." J.A. 493. On August 22, 2001, Bennett advised Thompson that Kameron "ha[d] been a danger to [Jane] and she should be protected," but that Bennett had "realistic hope that Kameron c[ould] deal with his emotions and be safely reunited with her." J.A. 439. She also noted that Jane "show[ed] some signs of sexual abuse including . . . a history of trying to sneak into Kameron's bed, probably for comfort through sexual contact." J.A. 440. Although the exact history of sexual abuse was unclear, Bennett noted that it was "very likely that they ha[d] engaged in inappropriate sexual encounters with adults and with each other." J.A. 440. During this period, Jane also

began to exhibit acting-out behaviors of a sexual nature, including overly affectionate behavior towards boys and men, as well as anger and aggressiveness when she was frustrated.

On November 26, 2001, Jane was placed in foster care with Bill and Pam Hamerick, where she could be seen by Kameron's therapist, Titsa M. Flesch, and have sibling visits with Kameron, including some overnight visits on weekends and holidays. On September 9, 2002, Kameron was placed in the Hamericks' home as well. By this time, SCDSS had filed an action in family court seeking to legally terminate the parental rights of the biological parents, in order to pursue a joint adoption of the siblings. Following a contested proceeding, the mother voluntarily relinquished her parental rights, and the parental rights of the father were judicially terminated. The family court granted "[c]ustody of the minor children . . . to [SCDSS] with all rights of guardianship, placement, care and supervision, including the authority to approve medical treatment or educational plans, to secure placement for the minor children and the sole authority to consent to any adoption, with the authority to seek such routine and emergency medical care as [SCDSS] deems necessary and in the best interests of said minor children." J.A. 316.

Plaintiffs Gregory and Michelle Johnson completed an application for adoption in May 2002. The Johnsons expressed their understanding that the "children [we]re in the system because of abuse, neglect, etc.," and they stated that they "fully underst[oo]d the therapy issues." J.A. 673. They were willing to accept a child or children (including a sibling group) with "mild/treatable" sexual abuse, J.A. 673, but not a child who was "sexually aggressive" towards other children, J.A. 672. In January 2003, Thompson presented a background summary on Kameron and Jane to the Johnsons. Thompson claims that the summary contained all of the information available to her about the children, including the allegations that they had been sexually abused. It stated that the children had been removed from the birth home for allegations of sex-

ual abuse but that Jane had been inconsistent in her reports of abuse, alternatively naming her birth mother, Kameron, her maternal grandfather, and her mother's boyfriend as having been sexually inappropriate or abusive toward her. Kameron had also been inconsistent at times, both denying and admitting inappropriate contact with his mother. He denied knowledge of any inappropriate contact between Jane and the adults. In the end, the Johnsons were advised that SCDSS had been unable to substantiate or rule out sexual abuse of either child. However, the summary represented that "[t]here ha[d] been no reports of any sexually inappropriate behavior from Kameron *since* entering care" and that "[p]art of his therapy ha[d] been to insure that he understands boundaries, good touch-bad touch rules and appropriate social interactions." J.A. 280 (emphasis added).

On February 28, 2003, Jane and Kameron were placed with the Johnsons for prospective adoption. Approximately four weeks after the placement, however, the Johnsons chose not to proceed with the adoption of Kameron, and he was removed from the Johnsons' home. Among other things, Kameron was believed to have inappropriately touched the Johnsons' biological son. Jane remained with the Johnsons though, and her adoption was finalized on November 6, 2003.

Approximately one year later, Kameron admitted to his therapist that he had sexually abused Jane prior to SCDSS's removal of them from the birth home. Kameron also claimed to have sexually abused seven foster children while in foster care, both before and after his placement with the Johnsons. Kameron's social worker notified the Johnsons that Kameron had claimed to have had an inappropriate sexual relationship with Jane prior to SCDSS's taking custody of them, but Jane told her therapist "that Kameron was lying and that they were still having 'sex' until they moved in with [the Johnsons]." J.A. 872. She also claimed that she told Thompson and Flesch that Kameron had sexually abused her while she was with the Hamericks and at other foster homes that she could not recall,

although she was inconsistent as to whom she told first. According to Jane, Thompson "told her not to tell anyone or they would never adopt her." J.A. 872. Thompson denies that Jane made any such report to her. She claims that she received no reports of any inappropriate behavior or contact between Jane and Kameron occurring during her relationship with Jane, and represents that she never observed any behavior which would have led her to believe that Jane and Kameron were having sexual or other inappropriate contact at that time.

Since the disclosure, Jane's behavior has significantly deteriorated. According to the Johnsons, she cannot be left alone or trusted, they are unable to obtain any help supervising her, and they cannot leave her alone with other children for fear that she will act out sexually. Among other things, she is physically and sexually aggressive, violent towards the Johnsons and their biological children, and abusive to animals. Her behavior has necessitated therapeutic placements outside the home, and further care and treatment is believed to be indicated.

The Johnsons subsequently filed suit on their own behalf, and as parents and guardians of Jane, against Thompson. They alleged under § 1983 that Thompson violated Jane's substantive due process rights under the Fourteenth Amendment by placing her in foster care settings with Kameron knowing that Kameron was sexually abusive toward Jane. The Johnsons alleged that Thompson also violated their substantive due process rights by failing to fully disclose the sexual history of Jane and Kameron prior to Jane's adoption. The Johnsons filed a second suit in state court against SCDSS, pursuant to the SCTCA, alleging numerous state law claims, including a claim of gross negligence on the part of SCDSS employees in the placement and adoption process. This action was removed to the district court and consolidated with the federal action.[1]

---

[1] A number of additional parties, known and unknown, were originally named as defendants in both lawsuits. The only remaining claims on

Thompson moved for summary judgment, claiming that she was entitled to qualified immunity from suit for the § 1983 claims. SCDSS also moved for summary judgment, claiming that it was entitled to discretionary immunity from suit for the state law claims under the SCTCA. The district court granted the defendants' respective motions for summary judgment on all claims, and this appeal followed. We review the district court's decision to grant summary judgment to the defendants *de novo*. *See Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007).

## II.

### A.

Qualified immunity from § 1983 claims "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is intended to "balance[ ] two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

Claims to qualified immunity present a two-pronged inquiry. The governmental official will be granted immunity

---

appeal, however, are the § 1983 substantive due process claims against Thompson and the gross negligence claims against SCDSS. The Johnsons also included as plaintiffs ten unnamed and unidentified children allegedly sexually molested by Kameron while in foster care, but they have not certified the matter as a class action, identified these children, or demonstrated that they have standing to bring the action on their behalf. To the extent the Johnsons pursue these claims on appeal, we summarily affirm their dismissal.

unless (1) "the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right," *Pearson*, 129 S. Ct. at 815-16, *and* (2) "the right at issue was 'clearly established' at the time of [the] alleged misconduct," *id.* at 816. However, it is within our discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 818; *see Hunsberger v. Wood*, 570 F.3d 546, 552 (4th Cir. 2009).[2]

This case involves the important issue of whether and under what circumstances a child who has been involuntarily removed from her home by state social workers and knowingly placed in a dangerous foster care environment may state a claim for damages under § 1983. Because we believe this case will clarify and elaborate upon our prior jurisprudence in important and necessary ways, we will first address the constitutional rights of foster children in such circumstances prior to addressing whether any such rights were clearly established at the time of the alleged wrongdoing. *See Pearson*, 129 S. Ct. at 818 (confirming that the *Saucier* "two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable").

---

[2]At the time of the district court decision, the Supreme Court directive was that courts address the first prong, and determine whether there was a violation of a constitutional right, prior to turning to the second prong to determine whether that right was clearly established at the time of the alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This, the Court reasoned, was "necessary to support the Constitution's 'elaboration from case to case' and to prevent constitutional stagnation." *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009). In *Pearson*, however, the Supreme Court held that "the *Saucier* procedure should not be regarded as an inflexible requirement," and that courts may choose in appropriate circumstances to grant qualified immunity to state actors "on the ground that it was not clearly established at the time [of the challenged acts] that their conduct was unconstitutional." *Id.* at 813.

B.

The Due Process Clause of the Fourteenth Amendment bars States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (internal quotation marks omitted). It "also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (internal quotation marks omitted); *see County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (The Due Process Clause "cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them." (internal quotation marks omitted)); *Love v. Pepersack*, 47 F.3d 120, 122 (4th Cir. 1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them." (internal quotation marks omitted)).

Here, Jane claims that Thompson violated her substantive due process right to reasonable safety and security when Thompson placed Kameron with Jane in foster care, knowing that Kameron was sexually abusing Jane. At a minimum, she asserts that Thompson knew or should have known that the sexual abuse was or probably would be continuing and was deliberately indifferent to the risk Kameron posed to her. The district court rejected the claim, however, holding that Jane had no substantive due process right to affirmative state protection from violence inflicted at the hands of Kameron, a private actor, in the foster care setting. Accordingly, it held that Thompson was entitled to qualified immunity from suit.

1.

As a general rule, "the Due Process Clause works only as a negative prohibition on state action," *Pinder v. Johnson*, 54

F.3d 1169, 1174 (4th Cir. 1995) (en banc), and the state's "failure to protect an individual against private violence simply does not constitute a violation of [it]," *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). "Its purpose was to protect the people from the State, not to ensure that the State protected them from each other." *Id.* at 196. Thus, it "serves 'as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security,'" *Patten v. Nichols*, 274 F.3d 829, 836 (4th Cir. 2001) (quoting *DeShaney*, 489 U.S. at 195), and "does not require governmental actors to *affirmatively* protect life, liberty, or property against intrusion by private parties," *Pinder*, 54 F.3d at 1174 (emphasis added); *see Patten*, 274 F.3d at 836 ("[T]he clause 'confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" (quoting *DeShaney*, 489 U.S. at 196)). And, because "the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *DeShaney*, 489 U.S. at 196-97.

In *DeShaney*, the state's Department of Social Services received several reports of suspected physical abuse of a child, Joshua DeShaney, while he was in the custody of his father. The state failed to intervene and Joshua was eventually beaten and permanently injured by his father. Relying upon the Supreme Court's decisions in *Estelle v. Gamble*, 429 U.S. 97, 105 (1976) (holding that a state's "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983" for violation of the Eighth Amendment), and *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (employing the Fourteenth Amendment to hold that disabled persons who are involuntarily committed to a state hospital retain "constitutionally protected [liberty] interests in conditions of reasonable care and safety"), Joshua and his mother sued the

department and its employees under § 1983, alleging that they had similarly "deprived Joshua of his liberty interest without due process of law . . . by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *DeShaney*, 489 U.S. at 193.

Although noting that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals," *id.* at 198, the *DeShaney* Court held that the defendants owed no such duty to Joshua. This was because in *Estelle* and *Youngberg* the affirmative duty arose not from knowledge of any particular danger or an intent to help, but rather from the state's act of taking the individual into its custody and care.

> Taken together, [*Estelle* and *Youngberg*] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs — *e.g.*, food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 199-200 (citations and footnote omitted); *see Patten*, 274 F.3d at 841 ("[T]he Supreme Court in *DeShaney* made it clear that an exception to the general no-duty-to-act rule

arises only if the state takes an individual into custody; if there is no custodial relationship, then the state has no duty to protect."); *Pinder*, 54 F.3d at 1175 ("Some sort of confinement of the injured party — incarceration, institutionalization, or the like — is needed to trigger the affirmative duty [to protect]. This Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause." (citation omitted)). Thus, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty — which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not [the State's] failure to act to protect his liberty interests against harms inflicted by other means." *DeShaney*, 489 U.S. at 200.

Joshua could not state a substantive due process claim against the state officials because "the harms [he] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor." *Id.* at 201. Furthermore, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.*

2.

The issue before us today, however, is whether a child who has been involuntarily removed from her home by state officials for abuse or neglect, placed in the legal custody of the SCDSS, and transferred to state-approved foster care by SCDSS officials can state a substantive due process claim against a state social worker for violations of her fundamental right to personal safety and security analogous to that recognized in *Estelle* for prisoners and in *Youngberg* for the involuntarily committed and, if so, what degree of culpability must

be demonstrated to subject the social worker to liability under § 1983.

As the *DeShaney* Court noted, several circuit courts had already "held, by analogy to *Estelle* and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents." *Id.*; *see*, *e.g.*, *Taylor v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987) (en banc) (holding that a child involuntarily placed in a foster home may state a cause of action under § 1983 for the state official's deliberate indifference to her right to safety); *Doe v. New York City Dep't. of Soc. Servs.*, 649 F.2d 134, 145 (2d Cir. 1981) (holding that "[d]efendants may be held liable under § 1983 [for a child's injuries suffered during foster care] if they . . . exhibited deliberate indifference to a known injury, a known risk, or a specific duty."). In such cases, unlike in *DeShaney*, there would not be a mere "failure to act" on the part of a state official to remove a child from a family member, but rather the exercise of affirmative state action in the form of involuntary removal and placement of the child in a dangerous, foster care environment, *i.e.*, a "restraint of personal liberty triggering the protections of the Due Process Clause." *DeShaney*, 489 U.S. at 200. The *DeShaney* Court, however, expressly declined to decide the question because, unlike in these situations, the state had returned Joshua to the custody of his father. *See id.* at 201 n.9 (declining to decide whether a substantive due process claim could have been brought "[h]ad the State by the affirmative exercise of its power removed Joshua from free society and placed him in a foster home operated by its agents").

Since *DeShaney*, additional circuits have also recognized the right of a foster child to bring a substantive due process claim where state officials have taken the affirmative action of involuntarily removing the child from his home and placing him in a known, dangerous foster care environment, in deliberate indifference to the child's right to reasonable safety

and security. In *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846 (7th Cir. 1990), for example, the court distinguished *DeShaney* and applied a custodial exception to recognize a due process claim where a child was involuntarily removed from the custody of his parents and placed by child welfare workers with a foster parent the state knew or suspected to be a child abuser:

> This is not a "positive liberties" case, like *DeShaney*, where the question was whether the Constitution entitles a child to governmental protection against physical abuse by his parents or by other private persons not acting under the direction of the state. The Supreme Court agreed with this court that there is no such entitlement. Here, in contrast, the state *removed* a child from the custody of her parents; and having done so, it could no more place her in a position of danger, deliberately and without justification, without thereby violating her rights under the due process clause of the Fourteenth Amendment than it could deliberately and without justification place a criminal defendant in a jail or prison in which his health or safety would be endangered, without violating his rights either under the cruel and unusual punishments clause of the Eighth Amendment (held applicable to the states through the Fourteenth Amendment) if he was a convicted prisoner, or the due process clause if he was awaiting trial. In either case the state would be a doer of harm rather than merely an inept rescuer, just as the Roman state was a doer of harm when it threw Christians to lions.

*Id.* at 848-49 (citations omitted); *see Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997) ("[O]nce the State removes a child from her natural parents, it assumes at least a rudimentary duty of safekeeping. It cannot place a child in custody with foster parents it knows are incompetent or dangerous." (citation omitted)); *see also Nicini v. Morra*, 212

F.3d 798, 808 (3d Cir. 2000) (en banc) ("[W]hen [a] state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties" which, if attended to in a manner deliberately indifferent to the safety of the child, can give rise to liability under § 1983); *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 293 (8th Cir. 1993) ("[A] special custodial relationship . . . was created by the state when it took [a child] from his caregiver and placed him in foster care" where the "child los[t] his freedom and ability to make decisions about his own welfare, and must rely on the state to take care of his needs."); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992) ("[C]hildren in the custody of a state ha[ve] a constitutional right to be reasonably safe from harm" and "if the persons responsible place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs."); *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 476 (6th Cir. 1990) (holding that substantive "due process extends the right to be free from the infliction of unnecessary harm to children in state-regulated foster homes" where the complaint alleged that the state officials "were 'deliberately indifferent' to reports of abuse" in the foster home).

3.

Relying upon a trilogy of cases discussed below, Thompson contends that our circuit, in contrast to our sister circuits, has answered *DeShaney*'s unresolved question in the negative and would not recognize such a claim of deliberate indifference in the foster care placement, and the district court "reject[ed] plaintiffs' attempt to establish a custodial or foster care exception to the *DeShaney* rule," even in the limited context that we face today. J.A. 1004. While we agree with Thompson's alternative contention that any such right was not clearly established at the time she made her placement deci-

sions in this case, we disagree that they foreclose our recognition of such a right in appropriate cases.

In *Milburn v. Anne Arundel County Department of Social Services*, 871 F.2d 474 (4th Cir. 1989), a minor child who had been voluntarily placed in foster care by his parents sustained significant injuries which were reported by medical providers to social services officials as suspected child abuse. After the fourth such incident, the officials intervened and removed the child from the foster home. Applying *DeShaney*, we held that the child had no substantive due process right to affirmative protection by the state. First, the state "by the affirmative exercise of its power had *not* restrained the [child's] liberty; he was voluntarily placed in the foster home by his natural parents." *Id.* at 476 (emphasis added). In addition, "the injuries to the [child] did not occur while he was in the custody of the State of Maryland, [but] rather while he was in the custody of his foster parents, who were not state actors." *Id.* There being no affirmative exercise of the state's power to restrain the child's liberty in the first instance, there could be no corresponding duty or responsibility on the part of the state officials to protect the child from harm by private parties. *See K.H.*, 914 F.2d at 849 (noting our decision in *Milburn* to be "[c]onsistent with [its custodial] distinction," as *Milburn* "emphasize[d] the state's lack of responsibility for a child's *voluntary* placement by the natural parents in an abusing private foster home"); *cf. Walton v. Alexander*, 44 F.3d 1297, 1303-04 (5th Cir. 1995) (en banc) ("Since *DeShaney* was decided . . . , we have followed its language strictly and have held consistently that *only* when the state, by its affirmative exercise of power, has custody over an individual *involuntarily or against his will* does a 'special relationship' exist between the individual and the state.").

In *Weller v. Department of Social Services*, 901 F.2d 387 (4th Cir. 1990), we held that a foster child could not maintain a substantive due process claim against state agents who had affirmatively removed the child from the home of his natural

father, upon allegations of abuse, where the child was immediately transferred to the custody of his natural grandmother and then to his natural mother. At no point was the child in foster care, nor was there any prior indication that the family members to whom the child was transferred posed any danger to the child. We agreed "that *DeShaney* [was] applicable to the extent that Maryland had no duty to provide [the child] with protective services" in the first instance and held that "the transfer of custody [from one family member to another] did not make the State 'the permanent guarantor' of [the child's] safety." *Id.* at 392 (quoting *DeShaney*, 489 U.S. at 201). Also, as in *Milburn*, any actual physical harm that was inflicted upon the child at the hands of his family members "was not [harm] inflicted by the State." *Id.*

This brings us to the case of *White ex rel. White v. Chambliss*, 112 F.3d 731 (4th Cir. 1997), and the one most analogous to the case before us. In *White*, SCDSS officials involuntarily removed Keena White, a minor child, from the physical custody of her natural mother and placed her in an approved foster home, where she later died from severe blows to the head. The mother brought a § 1983 action alleging that the SCDSS officials had a duty to protect Keena from abuse after her placement in foster care and, in the alternative, had been deliberately indifferent in their placement of Keena in the foster home.

We rejected the plaintiff's claim that there was a general duty on the part of the SCDSS workers to protect the child from abuse after she was placed with the foster family because "children placed in foster care ha[ve] no federal constitutional right to state protection" and "the state ha[s] no affirmative constitutional obligation to protect individuals against private violence." *Id.* at 737 (citing *Milburn*, 871 F.2d at 476); *see id.* at 738 ("'[H]arm suffered by [the] child at the hands of h[er] foster parents [wa]s not harm inflicted by state agents,'" (quoting *Weller*, 901 F.2d at 392)). We further noted that, as it pertains to this principle, *Milburn* was not limited

in "its application to situations where parents had voluntarily placed their children in foster care." *Id.*

In this case, SCDSS takes the position that no protection means no protection and that Fourth Circuit law allows SCDSS officials to also escape § 1983 liability when they affirmatively place a child in a known dangerous environment, including, for example, with a known child predator. However, in *White*, we declined to dispose of the question of whether a § 1983 action could be maintained against a social worker who knowingly places a child in a dangerous foster care environment, in deliberate indifference to the child's fundamental right to personal safety and security. Instead, we held that the factual record before us there fell short of demonstrating any such deliberate indifference. *See id.* at 737 ("Whatever the clearly established law on this question, White's claim simply falls short on the facts. The summary judgment record contains no evidence to indicate that any of the DSS defendants knew or suspected that the [foster parents] were abusive foster parents when they placed Keena in their care. Indeed, the [foster parents] were licensed by the DSS, and White points to no evidence indicating that the [foster parents] had previously been accused of, or investigated for, child abuse."). Such "[a] claim of deliberate indifference, unlike one of negligence," we held, "implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice." *Id.*

We now hold that when a state involuntarily removes a child from her home, thereby taking the child into its custody and care, the state has taken an affirmative act to restrain the child's liberty, triggering the protections of the Due Process Clause and imposing "some responsibility for [the child's] safety and general well-being." *DeShaney*, 489 U.S. at 200. Such responsibility, in turn, includes a duty not to make a foster care placement that is deliberately indifferent to the child's right to personal safety and security. This does not mean that social workers will be duty-bound to protect the child from

unknown harm or dangers. Nor "does [it] mean that every child in foster care may prevail in a section 1983 action against state officials based on incidental injuries or infrequent acts of abuse." *Taylor*, 818 F.2d at 797. Negligence, and even carelessness, on the part of such officials that results in harm to the child will not support a claim. But "where it is alleged and the proof shows that the state officials were deliberately indifferent to the welfare of the child," liability may be imposed. *Id.* Such "[a] claim of deliberate indifference, unlike one of negligence, implies at a minimum that defendants were plainly placed on notice of a danger and chose to ignore the danger notwithstanding the notice." *White*, 112 F.3d at 737.

C.

Here, Jane was involuntarily removed from the custody of her natural parents by affirmative state action and ultimately placed in foster care approved by SCDSS. The state filed a complaint in family court alleging abuse, sought emergency and temporary custody and, ultimately, terminated the parental rights of her biological parents by judicial order. *See* S.C. Code Ann. § 20-7-1576 ("An order terminating the relationship between parent and child . . . divests the parent and the child of all legal rights, powers, privileges, immunities, duties, and obligations with respect to each other, except the right of the child to inherit from the parent."). Thus, unlike the children in *DeShaney*, *Milburn* and *Weller*, Jane was clearly within the custody and control of the state social services department when foster care placement decisions were made. Accordingly, the state officials responsible for those decisions had a corresponding duty to refrain from placing her in a known, dangerous environment in deliberate indifference to her right to personal safety and security.

We affirm the grant of summary judgment, however, under the second prong of the qualified immunity inquiry. Although our precedents do not foreclose a foster child's claim that her substantive due process right to personal safety and security

is violated by a foster care placement made in deliberate indifference to a known danger, such a right was not clearly established in this circuit at the time Thompson made her placement decisions regarding Jane.

In determining whether there has been a violation of a constitutional right, we must identify the right "at a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999). "In order for a right to be 'clearly established,' the Supreme Court has instructed that '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *White*, 112 F.3d at 737 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Although notice does not require that the 'very action in question has previously been held unlawful,' it does mean that 'in the light of pre-existing law the unlawfulness must be apparent.'" *Robles v. Prince George's County*, 302 F.3d 262, 270 (4th Cir. 2002) (quoting *Wilson v. Layne*, 526 U.S. 603 (1999) (internal quotation marks omitted)).

"In determining whether a [constitutional] right was clearly established at the time of the claimed violation, courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." *Edwards*, 178 F.3d at 251 (internal quotation marks and alteration omitted); *see Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc) (A law is "clearly established" when "the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." (internal quotation marks omitted)).

For the reasons discussed above, our precedents in *Milburn*, *Weller*, and *White* do not alone foreclose Jane's substantive due process claim. But neither did they, or any other precedent in the Supreme Court or this court, clearly establish that such a claim might have existed at the time of the placements.

And while we disagree with the district court's interpretation of *DeShaney* and our precedents, we do not view the interpretation to have been unreasonable. "[I]f judges . . . disagree on a constitutional question, it is unfair to subject [government officials] to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618; *see Hogan v. Carter*, 85 F.3d 1113, 1116 n.3 (4th Cir. 1996) (en banc) ("Although there might be instances where a reasonable jurist, but not a reasonable official, would consider particular conduct violative of clearly established law, if a reasonable jurist would not have viewed the defendant's action as violative of clearly established law, then it necessarily follows that the reasonable officer likewise would not have viewed that conduct as violative of clearly established law."); *Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991) ("Since qualified immunity is appropriate if reasonable officers could disagree on the relevant issue, it surely must be appropriate when reasonable jurists can do so." (citation omitted)).

Here, when the placement decisions were made, there was no authority from the Supreme Court or this circuit that would have put Thompson on fair notice that her actions violated Jane's substantive due process rights. On the contrary, given the precedents that did exist in our circuit on the issue of affirmative state protection of foster children, we think it quite reasonable for jurists and officials to have believed that we would have answered the *DeShaney* question in the negative and foreclosed the existence of such a right. In sum, because it would not have been apparent to a reasonable social worker in Thompson's position that her actions violated the Fourteenth Amendment, she is entitled to qualified immunity.[3]

---

[3]Because it is unnecessary to our disposition of this case, we decline to decide whether the record contains sufficient, admissible evidence to support Jane's claim that Thompson's decision to reunite Jane and Kameron in foster care rose to the level of deliberate indifference.

### III.

We turn briefly now to the Johnsons' § 1983 claim that Thompson violated their substantive due process rights by placing Jane and Kameron in their home without fully disclosing Jane's history of sexual abuse and sexual aggressiveness. The Johnsons acknowledge that the background summary presented to them by Thompson related some of this history. However, they assert that Thompson failed to disclose much of the history and reassured them that no inappropriate sexual behavior had occurred between the children, leading them to believe that the more serious allegations were unsubstantiated. They assert that had they known of the incest, and of Jane's sexually aggressive behavior, they would not have accepted Jane for prospective adoption or finalized her adoption. Thompson asserts that she presented all known information to the Johnsons and that she received no reports of inappropriate behavior between the children during her relationship with Jane.

The district court held that prospective adoptive parents have no substantive due process right to the disclosure of a child's history of sexual abuse and that Thompson was entitled to qualified immunity. We agree. The Johnsons have pointed to no authority from the Supreme Court, this court or, for that matter, any circuit court of appeals granting prospective adoptive parents a substantive due process right to "full disclosure" about a child under consideration and certainly no "clearly established" authority which would have put Thompson on notice that she was violating any such right. Accordingly, we affirm the grant of summary judgment on this claim as well.

### IV.

The plaintiffs' final claim is that the district court erred in granting summary judgment to SCDSS on their state law

claim for gross negligence on the part of the SCDSS officials who handled Jane's foster care placements and adoption.

In the state court action, the plaintiffs originally asserted claims for gross negligence, assault and battery, intentional infliction of emotional distress/outrage, negligent supervision, negligent training, false imprisonment, and premises liability. The district court dismissed all claims, holding that the decisions made by the SCDSS employees were discretionary in nature, entitling SCDSS to discretionary immunity under § 15-78-60(5) of the SCTCA.

The SCTCA constitutes the exclusive remedy for torts allegedly committed by employees of state agencies. *See* S.C. Code Ann. § 15-78-70(a). Under the Act, a governmental entity, such as SCDSS, is subject to liability for torts "in the same manner and to the same extent as a private individual . . . ." S.C. Code Ann. § 15-78-40.[4] However, the Act is a limited waiver of governmental immunity from suit and contains a list of exceptions to the waiver of immunity, including an exception for discretionary acts by the entity or its employees. Specifically, under § 15-78-60(5), "[t]he governmental entity is not liable for a loss resulting from . . . the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." *Id.*

Under South Carolina law, discretionary immunity is normally "contingent on proof that the [governmental entity], faced with alternatives, actually weighed competing considerations and made a conscious choice" to act. *Niver v. South*

---

[4]Because the actions complained of were taken by governmental employees acting within the course and scope of their employment, the district court correctly noted that SCDSS should be substituted as the party defendant for the individual defendants. *See* S.C. Code Ann. § 15-78-70(c).

*Carolina Dep't of Highways & Pub. Transp.*, 395 S.E.2d 728, 730 (S.C. Ct. App. 1990). "[T]he governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them." *Foster v. South Carolina Dep't of Highways & Pub. Transp.*, 413 S.E.2d 31, 35 (S.C. 1992). Generally speaking, the SCTCA must be liberally construed in favor of the governmental defendant. *See Faile v. South Carolina Dep't of Juvenile Justice*, 566 S.E.2d 536, 540 (S.C. 2002). However, "[t]he burden of establishing a limitation upon liability or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense." *Niver*, 395 S.E.2d at 730.

SCDSS asserts that it met its burden of establishing application of the discretionary acts exception to the waiver of immunity under S.C. Code Ann. § 15-78-60(5), because its employees relied upon professional standards when making the discretionary decision to place the children together and pursue their adoption as a sibling group. The district court agreed and held that SCDSS was entitled to discretionary immunity.

On appeal, the plaintiffs contend that, even if the majority of the state law claims were properly dismissed, the gross negligence claim was not because § 15-78-60(25) of the SCTCA excepts gross negligence from the normal application of discretionary immunity under § 15-78-60(5). S.C. Code Ann. § 15-78-60(25) provides that "[t]he governmental entity is not liable for a loss resulting from . . . responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner.*" *Id.* (emphasis added).

The South Carolina Supreme Court has held that "[s]ection 15-78-60(25) provides an exception to [discretionary] immu-

nity where the governmental entity exercises its responsibility or duty in a grossly negligent manner" and that "Section 15-78-60(5) must be read in light of this exception. If discretion is exercised in a grossly negligent manner, the exception to the normal rule of immunity applies." *Jackson v. South Carolina Dep't of Corr.*, 390 S.E.2d 467, 469 (S.C. Ct. App. 1989) (per curiam). It is unclear whether the Johnsons made this precise argument below, and the district court order does not separately or explicitly address the question of whether SCDSS is entitled to discretionary immunity from liability for the gross negligence claim. However, it does appear that South Carolina may recognize an exception to the grant of discretionary immunity where state officials exercise a duty to supervise, protect, control, confine, or maintain foster children "in a grossly negligent manner." *Id.*

Under the circumstances, we believe the best course is to vacate the grant of summary judgment on the state law claim for gross negligence and remand for the district court's consideration of the applicability of § 15-78-60(25) or, if deemed appropriate given our affirmance of summary judgment as to the federal claims, the propriety of remanding the state law claim back to the state court for its determination.[5]

V.

For the foregoing reasons, we affirm the district court's grant of summary judgment as to all claims asserted under § 1983 against Thompson. We vacate the grant of summary

---

[5]As the district court observed, the presentation of the claims below has been somewhat unclear. However, the claim for gross negligence asserted against SCDSS is contained solely within the state court complaint, which was removed to the district court and consolidated with the federal court action. Although the state court complaint also contained some federal claims, Thompson was not a named defendant. Accordingly, our decision today affirms the grant of summary judgment as to all claims in the federal court complaint and all *but* the state law claim for gross negligence in the state court complaint.

judgment as to the state law claim for gross negligence against SCDSS, and remand that claim for further consideration.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

WILKINSON, Circuit Judge, concurring in the judgment:

I agree with the affirmance of the grant of summary judgment to Thompson on all federal claims.* Maj. Op. at 26. I agree also with the vacatur of summary judgment and remand on the state claim, with explicit permission for the district court to further remand those claims back to state court. Maj. Op. at 26.

State court is the place where claims such as these should be heard. We should not further constitutionalize this intensely domestic area of the law. Every tort committed in this country by some public actor was never meant to be a matter of constitutional import. *See Paul v. Davis*, 424 U.S. 693, 701 (1976).

I disagree with the view that the Constitution imposes upon states a "duty to protect" children from harm by non-state actors in foster homes. Maj. Op. at 19-20. Such a holding is appealing in rhetoric and harmful in practice. The majority's rule constitutes an unnecessary expansion of substantive due process that, however well-intentioned, will visit real misfortune upon abused and neglected children. The creation of this federal cause of action is not merely a misadventure in constitutional theory but a real-life loss for those most in need of help.

---

*Specifically, I concur in the majority's view that, at the very least, qualified immunity is appropriate here on plaintiffs' cause of action for failure to protect, Maj. Op. at 20, and in the majority's view that there is no federal cause of action for failure to disclose. Maj. Op. at 23.

I.

Faced with the wrenching allegations of this case, it is understandably tempting to rush to Jane's rescue and somehow right whatever wrongs were perpetrated against her. I certainly share the majority's sympathy for any child subject to sibling sexual or physical abuse. However, I fear that the legal rule established, ironically and tragically, will have the exact opposite effect of that which is intended. Instead of helping children escape the desperate environment of abuse and neglect, it likely will hinder them in doing so. It will create a perverse set of incentives that will deter states and foster families from providing helpless children with the assistance they need.

More specifically, the new substantive due process right fashioned by the majority will lead to a combination of two separate but equally devastating effects: first, it will discourage states from taking legal custody of children in the first place, and second, it will discourage potential foster parents from becoming foster parents. Both outcomes disadvantage the countless children beaten, molested, or abandoned by their biological families—children who desperately need the safe haven provided by state custody and offered by willing foster families. In short, the "duty to protect" may well discourage protection and, ultimately, encourage harm.

A.

The first potential result of today's decision is to dissuade states from assuming legal custody of children altogether. As *DeShaney* made clear, and as the majority admits, if a state avoids taking custody of a child, it cannot be held legally responsible for harm suffered by the child, even if the state knew about the harm and stood by to watch. *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989); Maj. Op. at 12-13. A "duty to protect" arises, if at all, "only if the state takes an individual into custody; if there is

no custodial relationship, then the state has no duty to protect." *Patten v. Nichols*, 274 F.3d 829, 841 (4th Cir. 2001).

By contrast, if a state takes legal custody of a child, it now potentially faces steep liability. Before this decision, a state taking custody of a child from her biological parents, against the parents' wishes, already risked one form of litigation: a section 1983 suit by the biological parents for a violation of their substantive due process rights to "retain custody over and care for their children, and to rear their children as they deem appropriate." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 342 (4th Cir. 1994) (citations omitted). Now, after this decision, a state taking custody of a child from her biological parents, against the parents' wishes, is subject to a second form of litigation: a section 1983 suit by the child herself, perhaps brought many years after the initiation of custody, for a violation of the child's substantive due process rights to "safety and general well-being." Maj. Op. at 19 (quoting *DeShaney*, 489 U.S. at 200). By piling on this additional cause of action, the majority has littered the path to protecting children with section 1983 landmines.

Thus, in deciding whether to assume custody of a child, states are faced with two possible choices: allow the child to continue to suffer, with no accompanying risk of liability, or rescue the child and quite possibly defend against two lawsuits. It doesn't take a Law and Economics scholar to figure out how these prospects will affect rational state actors. The majority's "duty to protect" essentially rewards states for the exact opposite: for not protecting and for doing nothing. As we have previously recognized, "[i]f section 1983 liability attaches too readily to removal and placement decisions, the course of public agencies would invariably become one of inaction, thus leaving children in abusive environments." *White ex rel. White v. Chambliss*, 112 F.3d 731, 736 (4th Cir. 1997). The danger of deterrence in this context is particularly acute. In the case of law enforcement, any deterrent effect caused by section 1983 suits is often mitigated by the inevita-

ble public outcry over crime gone unaddressed. In the case of abused and neglected children, however, public outrage is often absent, since abuse occurring to the defenseless behind closed doors is typically invisible to public view.

We never learn, of course, precisely when the threat of liability produces inaction. The failure of agencies to take action never hits the judicial radar in quite the same manner as actions allegedly gone awry. But stacking the legal deck in the direction of inaction surely carries costs of its own. The skewing of incentives toward inaction can only harm those children who are badly mistreated by their biological families and who badly long to escape their hapless home surroundings. I need not detail the physical violence, sexual abuse, substance addiction, or outright abandonment and neglect that befall young children at the hands of those who should love them most. These sad stories are familiar to us all. *See, e.g.*, *DeShaney*, 489 U.S. at 191-93.

For these children, the threat comes not from the state's assumption of custody but from the state's refusal to assume custody. A social worker may sometimes seem about as popular as a tax collector, but sometimes that same social worker is a child's only lifeline, her sole hope of escaping a perfectly brutal and life-scarring state. By slamming social workers with multiple prospects for substantive due process suits, the majority's opinion discourages them from exercising custody and encourages them to leave children "defenseless in the face of physical abuse and brutality." *White*, 112 F.3d at 736.

This case illustrates the perils of a rule that discourages states from taking custody of children. Whatever SCDSS might or might not have done wrong once it removed Jane from her home, no one contends that SCDSS should have left her there. Jane's biological mother neglected her, as the South Carolina Family Court determined after a probable cause hearing, and allegedly sexually abused her; Jane's biological father was incarcerated; and moreover, Jane's brother alleg-

edly sexually abused her in their biological home even before he allegedly sexually abused her in foster homes. Thus, while it is all too easy to shovel opprobrium on SCDSS for its alleged shortcomings and make it the scapegoat for a terribly sad set of circumstances, it is worth remembering that the agency did not create the dangers of abuse or neglect. Those dangers were present long before SCDSS came on the scene, and ameliorating them is often no easy or simple task. But leaving the child to her fate is not the answer, and I respectfully protest the creation of multiple causes of action that encourage agencies to do just that.

### B.

The majority's approach is likely to have a second and similarly unfortunate effect: causing some who would otherwise choose to become foster parents to abandon their plans. If and when states do decide to assume legal custody, they will now need to be more on guard than ever against section 1983 suits, and in an effort to fulfill their new "duty to protect," states may become overly intrusive into the foster family unit. To be sure, some level of supervision is necessary. But to ensure that foster parents are not even unwittingly laying the basis for a later section 1983 action, states may go overboard, checking in on foster children in frequent, unexpected, inconvenient, and invasive visits to foster homes. States may subject foster parents to an onslaught of prying questions about their private lives. Further, lest they later face accusations of a constitutional nature, years after the fact, states may feel compelled to micro-manage the foster parenting process, dictating basic choices about diet, hygiene, education, activities, schedule, and interactions with peers—choices that are normally left to parents.

This is all contrary to the basic purpose of the Due Process Clause, which "was to protect the people from the State, not to ensure that the State protected them from each other." *DeShaney*, 489 U.S. at 196. Instead of protecting foster chil-

dren from the state, the majority uses the Due Process Clause to require states to protect foster children from other foster children, including, as here, their own biological siblings. Maj. Op. at 19-20. Leaving aside the fact that managing sibling relationships is among the foremost of parental duties, this rule might, at least on the margins, induce a state into deliberately placing siblings in different foster homes, just to be safe. Of course, there are undoubtedly cases in which we might want states to separate siblings, and if the facts alleged in this case turn out to be true, this case might be one of them. However, there are undoubtedly many other cases in which we would not want to skew legal incentives toward separating siblings. Children removed from their biological homes have already endured one significant dislocation, and we should not maximize the disruption of what remains of their family by placing law on the side of pulling them apart from their brothers and sisters.

For SCDSS, the only way to forestall a suit over whether an initial foster placement was good or bad is to continually monitor its consequences. But who would want to remain a foster parent under such a regime? The increased state intrusiveness encouraged by the majority's decision will again not work to the advantage of children. Although such heightened oversight may ferret out abuse by foster parents in a few cases, it is just as likely, and probably more so, to deter many fine individuals from ever agreeing to become foster parents in the first place. Although foster parents and biological parents do not share identical rights, they share similar purposes. As the Supreme Court has noted:

> "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot(ing) a way of life' through the instruction of children . . . . No one would seriously dispute that a deeply loving and interdependent relationship

between an adult and a child in his or her care may exist even in the absence of blood relationship. At least [in certain cases], it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family."

*Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 844 (1977) (citations omitted). To be effective, foster parents need some freedom in deciding how to raise their children and need to bond with their children away from the state's watchful eye. If agencies fearful of federal "duty to protect" suits are constantly making suspicion-laden inquiries and trying to direct decisions best made by parents, the satisfactions of foster parenting cannot be enhanced. And by making it less appealing to become a foster parent, fewer individuals will volunteer. Without willing foster families, children who are abused by their biological families will be increasingly deprived of a substitute home in which to find sanctuary.

The majority's analysis further works to put off potential foster parents by painting foster homes in an unfortunate light. The majority concludes that a state's removal of a child from her biological home is an exercise of custody sufficient to trigger the "duty to protect," insofar as it deprives the child of liberty in a manner "analogous to that recognized in *Estelle* for prisoners and in *Youngberg* for the involuntarily committed." Maj. Op. at 13-14. Indeed, the majority believes that the state's custodial relationship continues even *after* the state has placed a child in the care of foster families. Maj. Op. at 13-14.

Any comparison of the foster home environment to that of prisons and mental health institutions for substantive due process purposes is misplaced. A foster home is not a prison; a child therein is not "in custody" in the sense that inmates are; and such an analogy is a poor foundation for an expansion of substantive due process. Foster parents, who are rarely state

actors, *see Milburn v. Anne Arundel County Dep't of Soc. Servs.*, 871 F.2d 474, 479 (4th Cir. 1989), would hardly find it flattering to learn that their efforts at raising children were being analogized by courts to those of prison wardens and mental health superintendants. While wardens and superintendents provide valuable functions, most foster parents approach their responsibilities in a different spirit. By extending custody to the case at bar, the majority has drifted far afield from the context of physical confinement envisioned by *Estelle* and *Youngberg*. Those cases use words such as "incarceration" and "institutionalization" to describe actionable physical restraints, *see DeShaney*, 489 U.S. at 200, terms which are singularly inapposite to the foster home setting. In expanding the concept of custody in this fashion, the majority has misapprehended the nature of foster parents' services, all the while risking a variety of untoward effects.

The majority attempts to lull us into a false sense of security with its ruling that the state must have acted with "deliberate indifference" in its placement decisions in order for section 1983 liability to attach. Maj. Op. at 20. Under this standard, the majority reassures us, social workers will not be liable for "unknown harm or dangers" or every time a child suffers "incidental injuries or infrequent acts of abuse." Maj. Op. at 20 (citations and internal quotations omitted). Therefore, in theory, states should fear liability only in those cases where they have acted in a particularly blameworthy manner.

But these words are of little comfort. Standards of review are regrettably all too often in the eye-of-the-beholder. And words such as "incidental," "infrequent," and even "unknown" (which slips into "should have known") are by their nature elastic and at best imperfect protection against even groundless litigation. Thus, in practice, states will be deterred both from taking custody of abused children and encouraged to intrude upon foster families to the detriment of that unit, not because such decisions were dictated by their merits, but because of a threat of future liability. The mere threat of liti-

gation is enough to give officials pause, because even when state workers are ultimately absolved, litigation takes a toll. By diverting government officials from their duties, litigation "exacts heavy costs in terms of efficiency and expenditure of valuable time and resources," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1953 (2009), and potentially even "deter[s] . . . able citizens from acceptance of public office," or in this case social work. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).

To say the Constitution of the United States allows us to court these consequences, or even to flirt with the unpredictability of such serious harms, betrays an inflated conception of the federal judicial role. It is the majority's mistaken view of the boundaries of our function that I shall address in the next section and with which I also respectfully take issue.

## II.

Law exists in part to guard against the overreaching of public authority, and from that general purpose the life-tenured federal courts are not exempt. When the many cautionary maxims of restraint are toppled like dominos, the chances of judicial miscalculation exponentially increase. The majority's discovery of a constitutional "duty to protect" is badly misguided. But even if it were not—even if it were a great idea—we should not indulge in its creation. Federal courts simply do not have a roving warrant to adopt whatever policies they believe to be beneficial, all in the name of substantive due process. The project of creating such a duty should be left to the states, via statutes or the common law of tort. It does not belong to the federal government, via the Constitution. In creating this new "duty to protect," the majority commandeers a role traditionally—and for good reason—entrusted to state legislatures.

## A.

To begin, by federalizing the "duty to protect," the majority trespasses on the most traditional of state roles. The core legal

question in this case—who may be held liable for physical and psychological harm inflicted by one foster child upon another foster child—is essentially one of tort and domestic relations law. Both legal realms have historically and justifiably been reserved to the states. Decisions in these areas require weighing a number of competing policy considerations. Deciding whether and to what extent to impose a "duty to protect," for example, demands a delicate balancing of the interests of children, foster parents, biological parents, and states. Others have devoted far more thought to these hard problems than we ever could. Given their experience with, and acquired expertise over, matters of tort and family law, states are better suited than the federal government to make such intricate determinations. As the Supreme Court explained, the "host of policy choices" implicated in cases such as this one "must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992).

Indeed, most states have made such policy choices, enacting statutes addressing whether and when to provide recourse to children injured while in state custody or in the care of foster parents. South Carolina is one such state. *See* S.C. Code Ann. § 15-78-70. I run the risk of length in describing its efforts, but that is only to contrast it with the brief and episodic nature of the majority's federal judicial foray. The South Carolina Tort Claims Act (SCTCA) is a comprehensive statutory scheme, which covers a breadth of situations in which an individual might be harmed by a state agency. S.C. Code Ann. § 15-78-10 *et seq.* It exhaustively delineates the circumstances in which a state agency, such as the South Carolina Department of Social Services (SCDSS), *see Joubert v. S.C. Dep't of Soc. Servs.*, 341 S.C. 176 (S.C. App. 2000), may be held liable for torts. Not surprisingly, plaintiffs brought suit under the SCTCA as well as under 42 U.S.C. § 1983.

South Carolina's statute begins with a baseline rule that state agencies may be liable for torts to the same extent as pri-

vate individuals. S.C. Code Ann. § 15-78-40. It then creates certain exceptions to the general rule, providing immunity in instances where an agency employee exercises discretion. S.C. Code Ann. § 15-78-60(5). The immunity, however, does not attach where the agency employee is guilty of "gross negligen[ce]." S.C. Code Ann. § 15-78-60(25). The SCTCA then fills in missing pieces with specific provisions addressing, for example, the statute of limitations, S.C. Code Ann. § 15-78-110, appropriate remedies and damages caps, S.C. Code Ann. § 15-78-120, and implications of state liability insurance. S.C. Code Ann. § 15-78-140, -150, -160.

When the South Carolina legislature has not spoken, the South Carolina courts have stepped up interstitially. *See, e.g.*, *City of Hartsville v. S.C. Mun. Ins. & Risk Financing Fund*, 382 S.C. 535 (2009) (discussing proper burden of proof under the SCTCA); *Faile v. S.C. Dep't of Juvenile Justice*, 350 S.C. 315 (2002) (discussing meaning of "gross negligen[ce]" under SCTCA); *Jensen v. Anderson County Dep't of Soc. Servs.*, 304 S.C. 195 (1991) (discussing whether SCDSS's decision regarding whether to investigate a report of child abuse was "discretionary"); *Varn v. S.C. Dep't of Highways & Public Transp.*, 311 S.C. 349 (S.C. App. 1993) (per curiam) (discussing whether a court can award costs of litigation under the SCTCA). Moreover, SCDSS has further established an extensive set of policies that touch every aspect of a child's care, developing numerous manuals to steer its many decisions affecting children, biological families, foster families, and adoptive families. *See* SCDSS, Manuals, http://dss.sc.gov/content/library/manuals/index/aspx. Its manual on "Foster Care," for example, is 180 pages of detailed guidelines regarding such matters as intake procedures, foster children with special needs and health concerns, appropriate levels of ongoing supervision of children in foster care, and decisions regarding whether and when to remove children from foster care. *See id.*

All in all, the scheme is quite a comprehensive one, making all the more puzzling the majority's intervention in this area.

As the majority acknowledges, the South Carolina legislature intended its statute to be "the exclusive remedy for any tort committed by an employee of a governmental entity." S.C. Code Ann. § 15-78-70(a); Maj. Op. at 24. Yet the majority nonetheless provides an additional, federal remedy for torts committed by employees of state government entities. Maj. Op. at 14. The majority does so without ever telling us what deficiency in South Carolina law or practice has led it to inter-vene with a cause of action all its own. In fact, the majority says that SCDSS employees may be liable when they act with "deliberate indifference" to foster care placements. Maj. Op. at 14. This standard seems a rough approximation of the "gross negligen[ce]" standard, and South Carolina has already acted to deny immunity in cases where agency employees are grossly negligent. S.C. Code Ann. § 15-78-60(25).

Thus, the sole purpose of the majority's cause of action, it would seem, is not to correct any identified deficiencies in state law but simply to allow plaintiffs access to federal courts, where federal judges may fashion over time their sepa-rate sets of policies which may converge or diverge from South Carolina's own legal scheme. Moreover, the basis for the intrusion is none other than substantive due process, which unlike its procedural cousin, limits the range of options available not only to South Carolina but to every state in this circuit in balancing the claims of families, children, and those state agencies charged with protecting their welfare.

To make matters worse, the majority's intrusion is undertaken pursuant to *Pearson v. Callahan*, 129 S.Ct. 808 (2009), which modified the Supreme Court's earlier pro-nouncements in *Saucier v. Katz*, 533 U.S. 194 (2001), to make unnecessary a federal declaration of rights in cases, such as this one, where qualified immunity is available to state actors and where the declaration can have no conceiv-able effect on the outcome of the case or controversy. Among its reasons for modifying *Saucier*, the Supreme Court noted that gratuitous proclamations of constitutional rights "may

create a risk of bad decisionmaking" and "depart[ ] from the general rule of constitutional avoidance and run[ ] counter to the older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Pearson*, 129 S.Ct. at 820, 821 (citations and internal quotations omitted). *Pearson*'s cautionary signals were sent for good reason, namely to deflect advisory and ill-advised judicial ventures into policy, which, with all respect, is what we have here.

In this case, Jane may in fact be entitled to recovery under the South Carolina statute—an issue which appropriately may be litigated in state court. *See* Maj. Op. at 26. And perhaps Jane is not entitled to relief, either because the facts do not develop in Jane's favor or because South Carolina may not allow recovery as a matter of law. But even if Jane cannot recover under state law—and perhaps especially if Jane cannot recover under state law—this court should not intervene to override that statutory result by allowing her to recover under federal constitutional tort. Any state court outcome may very well reflect a deliberate legislative decision regarding the relative merits of enhanced state liability versus the relative merits of permitting social workers some judgmental latitude in promoting an abused child's welfare and best interest. We should not assume that our federal rule is ipso facto better than the state's or that the South Carolina courts and legislature would gratefully welcome this court's recalibration of the balance they have struck. In fact, in enacting the SCTCA, the South Carolina General Assembly expressly "recognize[d] the potential problems and hardships each governmental entity may face being subjected to unlimited and unqualified liability for its actions," and therefore decided upon a system of neither "total immunity" nor "unqualified liability." S.C. Code Ann. § 15-78-20(a).

And if South Carolina is dissatisfied with the result under its statutory scheme, it may craft a new rule going forward.

That decision, however, is the prerogative of the state, not this court. As the Supreme Court explained in *DeShaney*:

> "The people of Wisconsin may well prefer a system of liability which would place upon the State and its officials the responsibility for failure to act in situations such as the present one. They may create such a system . . . . But they should not have it thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment."

*DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 203 (1989).

By federalizing the "duty to protect," the majority has effectively scuttled one of the primary benefits of federalism: the tolerance of varied state approaches to our most stubborn social problems. *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 386-87 (1932) (Brandeis, J., dissenting). Not only does the majority defeat the benefit of variation but it also incurs the cost of pile-on liability. By imposing a federal constitutional system of liability on top of a state system of liability, the majority has put into place a double whammy of deterrence coupled with a double wringer of litigation; states assuming children's custody will now have to fear no less than *two* liability schemes—one federal, one state—and perhaps, as happened here initially, *two* separate lawsuits—one in federal court, one in state court. And as noted, this dual system of deterrence may work to the detriment of those very persons it was designed to protect—the children whose chances in life depend on being rescued from the ravages of the most dysfunctional environments, even as multiple causes of action now counsel the rescuer to back off.

### B.

While state legislatures are the traditional fora for deciding whether to impose a "duty to protect," if the duty absolutely

must be federalized, it should be federalized by Congress, not by us. Congress is the appropriate institution to create any federal "duty to protect," since it can do so by statute rather than by Constitution, which is simply too blunt and rigid a tool for the imposition of general tort liability. If the matter is to be federalized, Congress could readily do so under its spending power, by creating rules for states and conditioning the receipt of federal funds on compliance with those rules. *See South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987). Congress can hold hearings and consult a wide range of public and expert opinion, thus enabling it to more accurately anticipate a proposed rule's potential consequences and to develop a policy with sufficient nuance to work in diverse factual circumstances. None of these tools did this court have at its disposal.

Legislatures are also comparatively better positioned to monitor the impact of a legal rule, once enacted, and if need be, to adapt the rule in light of changing circumstances or new information. If a law is indeed having a negative effect, legislatures "may recognize degrees of evil and adapt [their] legislation accordingly." *See Packer Corp. v. Utah*, 285 U.S. 105, 110 (1932). For judges, things are different. Because we are insulated from the democratic pulse, we learn of consequences, if at all, by fortuity. Although logic suggests that the majority's opinion will have the unfortunate result of leaving more abused children in the hands of the abusers, the truth is, without any feedback mechanism in place to help us assess our rulemaking, we may never know the extent of the harm caused. And even if we could, the harm could not easily be undone—not by us, bound as we are by precedent, and not by a legislature, since the majority has rooted its "duty to protect" in the Constitution.

Neither the majority nor the parties point to any instance where Congress has laid down a rule to govern the conduct in this case, and it is wrong for a federal court to rush in where Congress has feared to tread. Additionally, because the

textual underpinnings for the majority's duty are unclear, the Constitution supplies this court with very little to direct our task. "[T]he Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open-ended. The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted).

By basing its newfound duty in the elusive Due Process Clause, the majority has triggered a myriad of issues that this court will eventually have to address, with virtually nothing either to constrain or to guide our task. The majority creates a new substantive due process duty but leaves the rest hanging. What exactly are a state's affirmative obligations? What must it do to seek out information regarding a child's circumstances? How often and how extensive must supervision be? How do limitations periods and tolling principles apply when a foster child raises claims much later in life? From whom and from what must the state protect a child? From which of life's inevitable bumps and a family's inevitable strains and difficulties? These questions and others have no easy or obvious answers, but by "extend[ing] substantive due process to this area, these questions [will] be before us in short order, and it is hard to imagine what tools federal courts would use to answer them. At the end of the day, there is no reason to suppose that [our] answers to these questions would be any better than those of state courts and legislatures, and good reason to suspect the opposite." *Dist. Atty's Office v. Osborne*, 129 S.Ct. 2308, 2323 (2009).

So those who must follow the scarcely formed federal rule are simply left to guess. I suspect that fear of this nebulous liability will produce many instances of excess caution in assuming legal custody of battered children and of excess intervention into new family units. And in the future, when we are forced to further define the contours of the majority's

"duty to protect," we will be pushed further into the uncomfortable position of policy maker and will have to, bluntly, make stuff up. It is always tempting, I recognize, to respond to contentions that tug at the heartstrings, but I do not think state courts are cold or callous in a way that we are not, and I do think the states in their judicial and legislative capacities are where the very difficult tensions between familial and communal responsibilities should be resolved. Restraint in the judicial task can be the compassionate course. Allowing Jane to have her day in state court will both respect her individual claims to justice and avoid the heartache that creation of this new constitutional cause of action will involve.